## SECURITIES AND EXCHANGE COMMISSION
### v.
## LIBERTY BAKING CORPORATION.

### No. 67, Docket 24155.

United States Court of Appeals
Second Circuit.

Argued Nov. 16, 1956.

Decided Jan. 16, 1957.

Writ of Certiorari Denied April 8, 1957.
See 77 S.Ct. 719.

On July 6, 1955, Liberty Baking Corporation, appellee, filed a proceeding for an arrangement under Chapter XI of the Bankruptcy Act. The S. E. C. moved for leave to intervene and to dismiss the proceeding unless the petition were amended, or a creditors' petition were filed, in conformity with the provisions of Chapter X of that Act. On December 19, 1955, the district judge made an order denying this motion.[1] The S. E. C. has appealed.

Liberty, a Delaware holding company, has as its sole assets the stock of Bell Bakeries, Inc., and an open account against Bell. Before the institution of the proceedings for the reorganization of Liberty, Bell had filed a petition under Chapter XI.[2] Chapter XI arrangement for Bell was approved in June, 1955. The pertinent aspects of Bell's now confirmed reorganization are as follows:

The reorganization left undisturbed claims of secured creditors and of certain mortgage-holders apparently aggregating about $457,728.29. Creditors

---

1. That order antedated the Supreme Court's decision in General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516.

2. Bell's petition was filed December 31, 1953; Liberty's petition under Ch. XI was filed July 6, 1955.

were divided into three classes. Class A creditors (general creditors with claims under $100) were to be paid 65% of their claims upon confirmation. Class B creditors (unsecured trade creditors other than management) were to be paid 2½% on confirmation, 42½% in seventeen annual quarterly installments commencing three months after confirmation, and 20% three months after the due date of the last installment; Class B creditors were thus to be paid a total of 65% of their claims over a four and one-half year period, unless debtor exercises its option to pay 45% within 6 months of confirmation thereby discharging these debts at the lower percentage. Class C creditors were subordinated to Class A and Class B creditors; Class C represented management claims [2a] for loans to cover losses in commodity trading in the amount of $464,594; these claims were to be paid out over a four and one-half year period after the general trade creditors (Class A and B creditors whose claims amounted to $685,672) had been paid their 65%. At the time, management interests (hereinafter called Krug) agreed, in contemplation of a reorganization of Liberty, to a further subordination of these claims to those of Liberty's debenture holders; that is, in a reorganization of Liberty, management would accept common stock of that corporation in return for their claim against Bell.

Interest had been paid on Liberty's debentures from 1948, the time of their issuance, until 1953. The payment was made directly from Bell to the Indenture Trustee for Liberty's debenture holders, pursuant to an agreement between Bell and Liberty. After default of interest on the debentures on January 1, 1954, an attempt was made to secure postponement of interest for a year, but insufficient consents were received.[3] Liberty's petition under Chapter XI was then filed on July 6, 1955, based on the default in interest.

As of July, 1955, the combined balance sheet of Liberty and Bell showed assets of $3,069,783. Bell's corporate liabilities amounted to $1,770,696. Added to Liberty's debentures in the amount of $1,602,420, the consolidated liabilities of the two corporations amounted to $3,373,000 exclusive of unpaid interest on the debentures.[3a]

In 1935, Liberty underwent a reorganization pursuant to former Section 77B of the Bankruptcy Act. In 1947, in order to eliminate large arrearages on its preferred stock, a voluntary recapitalization was made. Since then, the earnings of Bell, from which Liberty derived all its income, have been sporadic. Net income for the two companies on a consolidated basis since 1946 has been as follows:

1946—$314,168 profit
1947—$181,764 profit
1948—$ 96,902 profit
1949—$163,716 loss
1950—$ 56,498 profit
1951—$ 53,658 profit
1952—$ 57,030 loss
1953—$651,680 loss
1954—$ 50,375 loss
1955—(first half) $11,000 profit.[3b]

---

**2a.** Class C creditors were divided into two groups. Class C 2, the management interests, were to be subordinate to a Class C 1 claim of about $600,000 which was to the Manufacturer's Trust Co., the indenture trustee.

**3.** Under the indenture, consent of 75% of the debentures, exclusive of management held or controlled debentures, is required for postponement of interest payments. Only 66% of the publicly held debentures consented.

**3a.** The balance sheet of January 1955 and earlier balance sheets, which were filed with the petition for Chapter XI arrangement, showed balances less favorable to the debtor.

**3b.** Mr. Krug's affidavit in support of the motion to dismiss S. E. C. intervention states a profit to be $11,834.71 as of August 6, 1955 (Liberty's Appendix 59a). The unsworn balance sheet submitted by debtor shows a net profit for the same period of $12,286.62.

Liberty has outstanding: (1) 4% debentures due in 1978, in the principal amount of $1,602,420, of which $1,031,820 are in the hands of 198 public investors;[4] (2) 791 shares of $4.00 preferred stock, with a liquidating preference of $23,700, which are held by 27 public investors; (3) 43,064$\frac{7}{20}$ shares of no par common stock at a stated value of $65,000, of which $13,000 are held by 160 public holders. In all, eliminating duplicate holders, there are 333 public investors in 20 states, holding over $1,000,000 in securities of Liberty. The common stock, 80% of which is held by management, has exclusive voting rights.

Under the proposed Liberty plan, the existing preferred shareholders (all public investors) would exchange one share of present preferred stock for one share of new preferred stock. The debenture holders (most of whom are public investors) would receive, for each $60 face value debentures held, new ($1.00 par value) preferred stock with a liquidation value of $50.00. The preferred stock is to be entitled to dividends of $2.50 annually, but the stock will be non-cumulative until after the fifth year following confirmation. Before any dividends must be paid on the new preferred stock, the trade creditors of Bell must be paid off, and Liberty must earn at least a net profit of $65,000 in the year in which the dividends are declared; as another condition precedent to payment of dividends on the new Liberty preferred stock, the working capital for that year must be $400,000.

Until five successive annual dividends are paid, the new preferred stockholders (mostly former debenture holders) may name three out of seven members of the board of directors. After five years, in the event the debtor defaults in payment of 12 quarterly dividends, the preferred will be permitted to elect four of the seven directors; this means that, for the first eight years, regardless of the outcome of the reorganization, the common stockholders (80% management) will control Liberty and that the debenture holders (almost all non-management) will have only a minority of the total votes.[4a]

The letter sent out by the Debenture Holders' Protective Committee (formed at a meeting called by management), to secure acceptance by the debenture holders of the proposed arrangement, failed to point out that there was a restriction on payment of dividends. It further failed to indicate that the debenture holders would not control if there were default in the payment of dividends, but to the contrary advised them that if there should be a default of three annual dividends they would elect the entire board of directors (as opposed to having to wait eight years and then electing four out of seven directors). The letter also stated that the Chapter XI proceedings disposed of the claims against Bell, and that Bell's "creditors" had agreed to settle for 65% of their claims, without indicating that Bell's creditors with claims of about $1,000,000 were not affected.

Levin & Weintraub, New York City, Benjamin Weintraub, Harris Levin, and Edwin S. Shapiro, New York City, of counsel, for debtor-appellee.

David M. Palley, New York City, for Debenture Holders' Protective Committee.

Simpson, Thacher & Bartlett, New York City, Horace J. McAfee and Henry

4. In connection with the issue of these debentures in 1947, a registration statement was filed with the S. E. C. pursuant to the Securities Act of 1933 and the Trust Indenture Act of 1939.

4a. 1. It is possible that the present debenture holders (who would be preferred stockholders under the proposed plan) could obtain control earlier. The default provision of the plan provides that the present debenture holders could elect all 7 directors if any default occurs under the plan of arrangement.

2. Since management owns about $\frac{1}{4}$ of the debentures, it is possible that even after 8 years the present management interest could maintain control since they might succeed in having elected as the fourth director someone who would represent their own interests.

Landau, New York City, of counsel, for indenture trustee.

Thomas G. Meeker, Gen. Counsel, David Ferber, Asst. Gen. Counsel, S.E.C., Washington, D. C., Richard V. Bandler, Kiva Berke, New York City, Joseph Gildenhorn, Washington, D. C., for Securities and Exchange Commission.

Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.

FRANK, Circuit Judge.

We take as our guide General Stores Corporation v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 519, where the Court affirmed this court's decision which, in turn, affirmed a district court order granting a motion like that made by the S. E. C. in the instant case. The Supreme Court said, "It may well be that in most cases where the debtor's securities are publicly held, c. X [11 U.S.C.A. § 501 et seq.] will afford the more appropriate remedy." However, the Court said that the fact that the debtor is a "large" corporation with a considerable amount of publicly held securities will not alone require dismissal of a Chapter XI proceeding with reference to "a simple composition of unsecured debts." The Court noted instances where a Chapter X proceeding must be employed, for the reason that it requires (1) appointment of a distinterested trustee with "broad powers of investigation," (2) the S. E. C. to render an advisory report on the plan, and (3) a plan which is "fair and equitable" as well as "feasible." The instances the Court noted are: (a) "Readjustment of all or a part of the debts of an insolvent company without sacrifice by the stockholders may violate the fundamental principle of a fair and equitable plan." Citing Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. (b) The "need for new management," since "without a new management today's readjustment may be a temporary moratorium before a major collapse." The controls required by Chapter X, said the Court, are "essential both where a complicated debt structure must be readjusted and where a sound discretion indicates either that there must be an accounting from the management or that a new management is necessary." The Court added that "those conditions only illustrate the need for c. X. There may be others equally compelling." The Court emphasized the importance of considering the General Store plan's feasibility, saying that, if the new proposed company were to succeed, "it may well need a more thoroughgoing capital readjustment than is possible under c. XI [11 U.S.C.A. § 701 et seq.]" In the light of General Stores, we think the Chapter XI proceedings must be dismissed, for the following reasons:

The proposed arrangement is for more than a "simple composition" of creditors. Not only is a considerable amount of Liberty's debentures held by public investors, but the arrangement would seriously disturb their rights. For, absent the Chapter XI arrangement, the debenture holders would be able to obtain control of management, since the common stock of Liberty is worthless. The arrangement would compel the debenture holders to accept, for their claims, preferred stock which would not only limit their share of the earnings and their share of the assets on liquidation, but deprive them of management control for at least 8 years. During those years, the old management, holder of all but a portion of the present common stock—all of which is now junior to the debentures—would have control of management, despite the fact that, as shown by the earnings, it has, over the years, been far from successful in running Liberty and Bell.

■ As a *quid pro quo*, the old management would subordinate its claim against Bell to the new preferred to be received by the debentures. Perhaps, although we do not so decide, it might be true that, were this claim beyond question, such a subordination would be a sufficient "sacrifice" to justify the very substantial modification of the debentures' rights. But the manner in which the management's claim against Bell

arose leaves considerable doubt whether that claim should not be ranked as junior to the Liberty debentures. It would be so ranked if, on investigation, it appeared that Bell's financial difficulties, which occasioned the management's loans to it, resulted from the initial insufficiency of its equity capital, for then the loans would be regarded as if they had taken the form of contributions to capital. Taylor v. Standard Gas & Electric Corp., 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669; cf. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Consolidated Rock Co. v. DuBois, 312 U.S. 510, 523–524, 61 S.Ct. 675, 85 L.Ed. 982. Such an investigation, adequately conducted, calls for Chapter X treatment.

There is here, then, a grave question whether the plan would deprive creditors of their "absolute priority" rights as against stockholders, Northern Pac. R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, a kind of question not nearly as obviously present in General Stores. Accordingly here the need for resort to Chapter X is much greater than was the need in General Stores.[4b]

In addition we have here factors which, if explored and disclosed by an independent trustee, might well lead to a determination by the publicly held debentures that a change of management is essential:[5] Over a period of 21 years, Liberty and Bell have experienced financial difficulties that have led to two proceedings under the Bankruptcy Act and a voluntary recapitalization.[6] There should be an adequate explanation of the consolidated loss of $651,680 in 1953.[7] The facts now of record suggest the possibility that an independent trustee's investigation might also reveal a need for "an accounting by the management for misdeeds" which caused the present necessity of a further reorganization.[8] The debenture holders cannot competently appraise the proposed plan without the educated advice of such a disinterested person. What an independent trustee's examination might disclose to those holders should be contrasted with the inaccurate and misleading letter which the Debenture Holders' Protective Committee sent them, recommending acceptance of the proposed plan as the "best possible in the present circumstances." In the light of Liberty's

---

**4b.** The debtor makes much of the amendment of Chapter XI eliminating the requirement that a plan of arrangement be "fair and equitable." We might assume, *arguendo*, that, if a plan is properly within Chapter XI, it need no longer measure up to that standard or to anything equivalent. Even so, in determining whether a proceeding properly comes within that Chapter, it is necessary, of course, to determine, among other things, whether the proposed arrangement contains features which bring it within Chapter X where the "fair-and-equitable" standard is applicable and where alone the facts relevant thereto will be fully investigated.

**5.** Section 172 of Chapter X, 11 U.S.C.A. § 572, requires the judge to submit a proposed reorganization plan to S. E. C. for examination and report where the scheduled indebtedness exceeds $3,000,-000. The consolidated liabilities of Liberty and Bell exceed that figure.

**6.** In General Stores v. Shlensky, 350 U.S. at page 467, 76 S.Ct. at page 519, the Court said: "The history of this debtor indicates not fraud but either an improvident overextension or a business that has been out of step with modern trends. One corporate reorganization has already been suffered."

**7.** The sole accounting, of record, for the 1953 loss was that made by Liberty's president as follows: "During this year management decided that it was necessary to change the brand name under which the Bell bread was being sold from Bell to Dandee. As a result of the advertising, promotion and selling and the fact that the transition could not be effective simultaneously at all plants, a good deal of sales volume was lost. In addition, management deemed it advisable at that time to decrease cake sales and to concentrate on the volume of bread sales because of the higher gross profits obtainable. This resulted in substantially the losses incurred that year."

**8.** Cf. General Stores, 350 U.S. at page 460, 76 S.Ct. at page 519.

troubled past—its "chain of difficulties" —there is pertinent here, re feasibility, the following statement of the Supreme Court, in Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 525, 61 S.Ct. 675, 685, 85 L.Ed. 982: "Whether or not the earnings may reasonably be expected to meet the interest and dividend requirements of the new securities is a *sine qua non* to a determination of the integrity and practicability of the new capital structure."

▇▇▇ Thus we have, in the instant case, important features which call for the application of Chapter X. Conceivably, under Chapter XI proceedings, a plan of arrangement might be presented which would unmistakably satisfy the requirements of Chapter X and would be as favorable to the creditors as what they could obtain under Chapter X. In such exceptional circumstances, we might not disturb the arrangement merely because it had been reached by Chapter XI proceedings. But that is not the case here. And since we conclude that Chapter X proceedings are the only appropriate means of dealing with reorganization of this debtor, we regard it as imperative that the case be remanded and a full investigation made—available in Chapter X only—to determine whether the plan is fair and equitable as well as feasible.

The debtor argues that, in General Stores, the Supreme Court referred to the district court's discretion.[9] But nowhere did the Court intimate that this discretion would not be reviewable in circumstances like those here. We think that the district judge overlooked the very narrow scope of Chapter XI.[10]

Reversed.

9. In fact, the Court referred to the exercise of discretion by "the two lower courts," i. e., the district court and the court of appeals.

10. In S. E. C. v. Wilcox-Gay Corp., 6 Cir., 231 F.2d 859, it is true that the court, referring to the Supreme Court's decision in General Stores, upheld the exercise of the District Court's discretion to permit Chapter XI proceedings. But there the facts were considerably different from those in the instant case: (1) The debtor had previously undergone Chapter X proceedings, and, following rather extensive investigation of its affairs in those proceedings, was permitted to go into Chapter XI proceedings after the secured creditors' claims were met in full. (2) The debenture holders (who held securities of about $220,000) received interest payments on their claims, and apparently only general (trade) creditors were included in the scaling down to 50% of their claims. (3) The court rested its decision on the ground that the analytical procedures available under Chapter X had in fact been carried out by the Trustee in the preceding Chapter X proceedings; the court was convinced that there was no need for further independent investigation; and no possible benefit could accrue to the general public, general creditors, or secured creditors by further investigation. Here, on the other hand, we have no such assurance or conviction. (4) Finally, in the Wilcox-Gay case, In re Wilcox-Gay Corp., D. C., 133 F.Supp. 548, 551, the debtor corporations were wholly owned by the creditors of the corporations, and the "outstanding securities of the debtor corporations have no present book value." There has been no testimony to the effect that the securities of the corporations in this case are without book value, and certainly the proposed arrangement here does not contemplate putting the control of the company in the hands of creditors, as did the arrangement in the Wilcox case.

In re Transvision, Inc., 2 Cir., 217 F. 2d 243, certiorari denied S. E. C. v. Transvision, Inc., 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744, involved no disturbance of the creditors' priority rights, and the plan affected trade and commercial creditors only. More important, that decision antedated the Supreme Court's decision in General Stores.