**In the Matter of HEROLD RADIO & ELECTRONICS CORPORATION, Debtor.**

United States District Court
S. D. New York.

Jan. 13, 1961.

Levin & Weintraub, and Frederick Nack, New York City, for debtor.

Louis Kipnis, New York City, for debenture holder.

Levy, Levy & Ruback, and Leinwand, Grossman & Maron, New York City, for official creditors committee; Isidor E. Leinwand, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for indenture trustee; George T. Lowy, New York City, of counsel.

Louis C. Feiland, New York City, for bondholder-creditor.

Richard V. Bandler, New York City, for Securities & Exchange Commission; Kiva Berke, New York City, of counsel.

Moses & Singer, New York City, for Bankers Trust Co., creditor; Arnold A. Jaffe, New York City, of counsel.

HERLANDS, District Judge.

What factors determine the choice between Chapter XI of the Bankruptcy Act (11 U.S.C.A. § 701 et seq.) and Chapter X (11 U.S.C.A. § 501 et seq.)?

This question—long debated but never resolved judicially by a pat formula—is the vortex of the present controversy.

United in their common advocacy of Chapter XI are the debtor, Bankers Trust Company (the largest secured creditor), and the Official Creditors' Committee. Ranged on the other side are three protagonists of Chapter X: the Securities and Exchange Commission and two debenture holders, Milton A. Abernethy and Kaufmann, Alsberg & Co. The S.E.C. and the two bondholders are the movants herein.

### I.

The S.E.C. has moved (1) to intervene in the pending Chapter XI proceeding of the debtor and (2) to dismiss the Chapter XI petition filed by the debtor and the proceeding under Chapter XI unless, within a period to be fixed by this Court, the petition is amended to comply with the requirements of Chapter X for the filing of a debtor's petition or a creditors' petition under Chapter X is filed.

Abernethy, a purchaser of $15,000 face amount of the debtor's 6% convertible subordinated debentures, has also moved for a dismissal of the Chapter XI petition on the ground that proceedings should have been brought under Chapter X.

The S.E.C.'s and Abernethy's dismissal motions are joined in by Kaufmann, Alsberg & Co., a member firm of the New York Stock Exchange and the owner of $154,000 face amount of the aforesaid issue of debentures. Kaufmann, Alsberg & Co. is alleged to be the largest single bondholder of the said issue, which totaled $1,500,000.

### II.

That it is easier to state a legal proposition than to apply it is again illustrated by the arguments of the parties. They rely on the same decisions; they pledge allegiance to the same principles. However, they differ sharply on the bearing that those same decisions have upon the particular facts of this case. What are the "significant" features of this case and its "controlling" aspects is, therefore, the critical question.

The desiderata pertinent to the S.E. C.'s motion to intervene and the S.E.C.'s and Abernethy's motions to dismiss the Chapter XI proceeding are closely interrelated, if not basically the same. They will, therefore, be considered together.

### III.

■■ A measure of "sound discretion" and "business" judgment resides in the Court in deciding these motions. Securities and Exchange Commission v. United States Realty & Improvement Co., 1940, 310 U.S. 434, 456, 60 S.Ct. 1044, 84 L.Ed. 1293; General Stores Corp. v. Shlensky, 1956, 350 U.S. 462, 467, 468, 76 S.Ct. 516, 100 L.Ed. 550; Securities and Exchange Commission v. Liberty Baking Corporation, 2 Cir., 1957, 240 F.2d 511, 516, certiorari denied 1957, 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 723; In Re Lea Fabrics, Inc., 3 Cir., 1959, 272 F.2d 769, 772, judgment vacated, Securities and Exchange Commission v. Lea Fabrics, 1960, 363 U.S. 417, 80 S.Ct. 1258, 4 L.Ed.2d 1515. This discretion has been described as "within the purview of the district court's discretionary exercise of its equity powers." In re Transvision, Inc., 2 Cir., 1955, 217 F.2d 243, 246, certiorari denied Security and Exchange Commission v. Transvision, Inc., 1955, 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744.

■■ Like all judicial discretion, it is a discretion that "must be a legal dis-

cretion, rather than one merely at will" (Cf. Afran Transport Co. v. Motor Tanker Bergechief, 2 Cir., 1960, 185 F.2d 119, or one that simply expresses the court's "own notions of equitable principles." Securities and Exchange Commission v. United States Realty & Improvement Co., supra, 310 U.S. at page 457, 60 S.Ct. at page 1054.

■ Discretion that is premised on the wrong criteria or that disregards well-settled principles is said to transcend "the allowable bounds" and is reversible. General Stores Corp v. Shlensky, supra, 350 U.S. at page 468, 76 S.Ct. at page 520; Securities and Exchange Commission v. Liberty Baking Corporation, supra, 240 F.2d at page 516, note 10.

## IV.

■ The crucial consideration in a choice between Chapter X and Chapter XI is "the needs to be served." General Stores Corp. v. Shlensky, supra, 350 U.S. at page 466, 76 S.Ct. at page 519.

■ The resolution of that problem depends "on the facts of the case whether the formulation of a plan under the control of the debtor, as provided by Chapter XI or the formulation of a plan under the auspices of disinterested trustees, as assured by Chapter X and the other protective provisions of that chapter, would better serve 'the public and private interests concerned including those of the debtor.' Securities and Exchange Commission v. United States Realty Co., 310 U.S. 434, 455 [60 S.Ct. 1044] (1940)." General Stores Corp. v. Shlensky, supra, 350 U.S. at page 465, 76 S.Ct. at page 518.

■■ Whether Chapter XI relief is adequate "is to be determined by the problems likely to be faced in the attempt to restore the debtor to health." Grubbs v. Pettit, 2 Cir., 1960, 282 F.2d 557, 562. And it has been pointed out that the district court may not overlook "the very narrow scope of Chapter XI." Securities and Exchange Commission v. Liberty Baking Corporation, 2 Cir., 1957, 240 F.2d 511, 516, certiorari denied, 1957, 353 U.S. 930, 77 S.Ct. 719.

In the following cases, Chapter X was preferred to Chapter XI: General Stores Corp. v. Shlensky, supra; Securities and Exchange Commission v. United States Realty & Improvement Co., supra; Securities and Exchange Commission v. Liberty Baking Corporation, supra.

In the following cases, Chapter XI was preferred to Chapter X: Securities and Exchange Commission v. Wilcox-Gay Corp., 6 Cir., 1956, 231 F.2d 859; In Re Transvision, Inc., supra; In re Lea Fabrics, Inc., supra.

The surface alignment of the six leading decisions becomes plastic in the hands of those who, by a process of selective emphasis that disregards context, find statements in the opinions and facts in the records that seemingly can be moulded to fit either side of rival arguments in a particular case.

In reality, these decisions form an harmonious body of law. They suggest a common thesis and a common approach.

In United States Realty & Imp. Co., supra, the Court concluded that the petition for an arrangement of unsecured debts under Chapter XI should be dismissed because the relief obtainable under that chapter was inadequate. The legislative history and the respective policies, purposes and operational procedures of the two chapters were compared and contrasted in Mr. Justice Stone's opinion.

In that case (310 U.S. at page 456, 60 S.Ct. at page 1053), the circumstances were "such as to raise a serious question whether any fair and equitable arrangement in the best interest of creditors can be effected without some rearrangement of its capital structure." The Court pointed out (310 U.S. at page 456, 60 S.Ct. at page 1053) that a Chapter X proceeding would permit an inquiry into the debtor's "financial condition and practices and its business prospects * * * without which there is at least danger that any adjustment of its indebtedness will not be just and equitable, and that its revived financial life will be too short to serve any public or private interest other than that of respondent [the debtor]."

In General Stores Corp. v. Shlensky, supra, the Court decided that proceedings under Chapter X rather than Chapter XI were appropriate. The Court's opinion (per Mr. Justice Douglas) pointed out (350 U.S. at page 466, 76 S.Ct. at page 519):

"The character of the debtor is not the controlling consideration in a choice between c. X and c. XI. Nor is the nature of the capital structure. * * * The essential difference is not between the small company and the large company but between the needs to be served.

"Readjustment of all or a part of the debts of an insolvent company without sacrifice by the stockholders may violate the fundamental principle of a fair and equitable plan * * * as the United States Realty Co. case emphasizes.

"Readjustment of the debt structure of a company without more may be inadequate unless there is also an accounting by the management for misdeeds which caused the debacle.

"Readjustment of the debts may be a minor problem compared with the need for new management. Without a new management today's readjustment may be a temporary moratorium before a major collapse.

"These are typical instances where c. X affords a more adequate remedy than c. XI."

In Securities and Exchange Commission v. Liberty Baking Corporation, supra, the Court concluded (240 F.2d 516) that there were "important features which call for the application of Chapter X," rather than Chapter XI. Judge Frank, writing for the Court of Appeals, pointed out (240 F.2d 514):

"The proposed arrangement is for more than a 'simple composition' of creditors. Not only is considerable amount of Liberty's debentures held by public investors, but the arrangement would seriously disturb their rights."

The Court also adverted (240 F.2d 515) to "a grave question whether the plan would deprive creditors of their 'absolute priority' rights as against stockholders," and to the need for determining whether "a change of management is essential."

At page 516 of 240 F.2d, footnote 10, Judge Frank distinguished Securities and Exchange Commission v. Wilcox-Gay Corp., supra, and In Re Transvision, Inc., supra, in the following discussion:

"In S. E. C. v. Wilcox-Gay Corp., 6 Cir., 231 F.2d 859, it is true that the court, referring to the Supreme Court's decision in General Stores, upheld the exercise of the District Court's discretion to permit Chapter XI proceedings. But there the facts were considerably different from those in the instant case: (1) The debtor had previously undergone Chapter X proceedings, and, following rather extensive investigation of its affairs in those proceedings, was permitted to go into Chapter XI proceedings after the secured creditors' claims were met in full. (2) The debenture holders (who held securities of about $220,000) received interest payments on their claims, and apparently only general (trade) creditors were included in the scaling down to 50% of their claims. (3) The court rested its decision on the ground that the analytical procedures available under Chapter X had in fact been carried out by the Trustee in the preceding Chapter X proceedings; the court was convinced that there was no need for further independent investigation; and no possible benefit could accrue to the general public, general creditors, or secured creditors by further investigation. Here, on the other hand, we have no such assurance or conviction. (4) Finally, in the Wilcox-Gay case, In re Wilcox-Gay Corp., D.C., 133 F.Supp. 548, 551, the debtor corporations were wholly owned by the creditors of the corporations, and the 'out-

standing securities of the debtor corporations have no present book value.' There has been no testimony to the effect that the securities of the corporation in this case are without book value, and certainly the proposed arrangement here does not contemplate putting the control of the company in the hands of creditors, as did the arrangement in the Wilcox case.

"In re Transvision, Inc., 2 Cir., 217 F.2d 243, certiorari denied S. E. C. v. Transvision, Inc., 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744, involved no disturbance of the creditors' priority rights, and the plan affected trade and commercial creditors only. More important, that decision antedated the Supreme Court's decision in General Stores."

Just as section 146(2) of Chapter X [11 U.S.C.A. § 546(2)] explicitly provides that that chapter may not be used where "adequate relief" would be obtainable under Chapter XI, so the United States Realty and General Stores cases hold that Chapter XI may not be resorted to where the relief and procedures available only under Chapter X are more appropriate for the protection of the public and private interests involved.

Chapter XI contains no provisions dealing with the rights of secured creditors or of stockholders and no provisions for notice to such parties of the various steps in the proceeding.

Where a referee confirmed an arrangement altering the rights of secured creditors, the order confirming the arrangement was vacated. In the Matter of Camp Packing Company, D.C.N.D.N.Y., 1956, 146 F.Supp. 935. Similarly, a Chapter XI proceeding was dismissed where it involved a transfer of all of the debtor's assets and affected the rights of stockholders. In re May Oil Burner Corporation, D.C.D.Md.1941, 38 F.Supp. 516.

In neither Chapter X nor Chapter XI is there any definition or classification that would enable the Court to say "that a corporation is small or large, its

security holdings few or many, or that its securities are 'held by the public,' " so as to place the debtor exclusively under one chapter rather than the other. Securities and Exchange Commission v. United States Realty & Improvement Co., supra, 310 U.S. 447, 60 S.Ct. 1049. The question is one of propriety "in the circumstances," giving due weight to "the public policy" of the two chapters, their "legislative history," their "terms," the comparative powers of the court under the two chapters, and the comparable adequacy of the relief and safeguards available under the two chapters.

The problem is not one of absolutes. The approach is not monolithic. It is pluralistic—evaluating the aggregate of circumstances in accordance with the guiding criteria expounded by the Supreme Court. Some of the pertinent questions are, for example: Who should control the administration of the debtor's estate and formulate plans for its rehabilitation? Should the features of speed and economy give way to the considerations of thoroughness and disinterestedness? Is there need for an independent study of the debtor's affairs by court or trustee? Is it desirable that advice be given to creditors with respect to their rights or interests in advance of their consent to a plan or arrangement? Is it appropriate that there be restriction on or supervision over the selection and conduct of creditors' committees? Does the situation call for something more than an arrangement of only the rights of unsecured creditors of the debtor, without alteration of the relations of any other class of security holders? Will effective relief probably entail re-arranging the capital structure of the corporation or will it involve only a simple composition of debts with unsecured creditors? Will there be any scaling down of the claims of creditors with or without some fair compensating advantage to them which is prior to the rights of stockholders? Will there probably be some readjustment of the rights of stockholders? Is it likely that the stockholders will be eliminated, and can this

question be answered with any assurance without resorting to the facilities for investigation of the financial condition and structure of the debtor? Is there a serious question of continuing the present management of the debtor?

The answer to no one single question is necessarily decisive. All of the sample questions suggest the breadth of the field to be canvassed. The breadth of the inquiry forecloses a solution by mechanically applying a rigid formula.

## V.

We turn then to a consideration of the particular circumstances of the case at bar.

### Nature of the Debtor's Business

The debtor was incorporated in the State of New York on March 2, 1950, under the name of Herold Radio & Television Mfg. Corp. It changed to its present name on June 9, 1955.

Since its inception, the debtor has been engaged in the business of manufacturing and distributing radios, phonographs, tape recorders, and other electronic equipment. It has two wholly-owned sales subsidiaries: Steelman Phonograph and Radio Co., Inc. and Roland Radio Corporation.

The debtor's products are sold in part to wholesale distributors under its trade name of "Roland" for radios and "Steelman" for phonographs and similar equipment. In addition, it manufactures for other companies who resell under their own brand names. In 1954, a research and development laboratory was established.

### The Debtor's Plant and Facilities

Initially, the operations were conducted in 2,500 square feet of leased space. As the operations increased, additional space was leased. By 1959, operations were conducted in nine separate locations.

In that year, the debtor consolidated operations in a new, leased plant in Yonkers, New York, constructed to the debtor's specifications. Production and warehouse space in this plant approximate 120,000 square feet.

Annual rental for the 21-year term of the lease is $111,000.

Additional parking space and railroad siding facilities are leased at an annual rental of $3,400.

### The Debtor's Outstanding Securities

The debtor has outstanding the following issues of securities:

| | |
|---|---|
| 6% Convertible Subordinated Debentures | $1,472,000 |
| $5.00 par Convertible Preferred Stock | 4,816 shares |
| $.25 par Common Stock | 582,199 shares |

These securities are all held by members of the investing public except that persons associated in the management of the debtor hold approximately 38% of the debtor's common stock.

There are approximately 400 holders of the debentures; 52 holders of the preferred stock; and 1,600 holders of the common stock.

The common stock is listed on the American Stock Exchange.

### Filing of Chapter XI Petition and Statement of Affairs

On August 15, 1960, the debtor filed a petition in this Court under section 322 of Chapter XI of the Bankruptcy Act [11 U.S.C.A. § 722]. The petition alleges that the debtor is unable to meet its debts as they mature and that it intends to propose a plan of arrangement pursuant to the provisions of Chapter XI.

Subsequently, on or about October 7, 1960, the debtor filed a statement of affairs and schedules.

No arrangement has as yet been proposed by the debtor.

### Consolidated Balance Sheet

The audited consolidated balance sheet of the debtor and its subsidiaries as at August 15, 1960, is as follows:

Assets

    Current Assets

| | |
|---|---|
| Cash | $ 6,435. |
| Accounts and Notes Receivable (Net) | 1,546,047. |
| Inventories | 2,976,094. |
| Prepaid Expenses | 11,421. |
|     Total Current Assets | 4,539,997. |
| Equipment and Fixtures (Net) | 596,258. |

    Deferred Charges & Other Assets

| | |
|---|---|
| Mortgage Receivable | 48,524. |
| Security Deposits | 17,010. |
| Deferred Research and Development Expenses | 445,048. |
|     Total Assets | $5,646,838. |

Liabilities

    Current Liabilities

| | |
|---|---|
| Due Bank (Secured by Receivables and Inventory) | $2,484,514. |
| Accounts Payable, Accruals, State Taxes | 1,941,668. |
| Taxes Due United States 1,619,946. Less: Loss Carry-Back 405,694. | 1,214,252. |
| Loans | 32,563. |
| Other | 141,146. |
|     Total Current Liabilities | $5,814,143. |

    Long Term Debt

| | |
|---|---|
| 6% Subordinated Convertible Debentures | 1,472,000. |
| Notes Payable Secured by Fixed Assets | 53,112. |
| Notes Payable to Finance Company | 61,000. |
|     Total Long-Term Debt | 1,586,112. |

    Capital

| | | |
|---|---|---|
| Preferred Stock, 6% Convertible $5 Par Value 24,080. | | |
| Common Stock $.25 Par Value | 145,549. | |
| Capital in Excess of Par Value | 822,957. | |
| Deficit (Earned) | (2,746,004) | |
| Net Capital deficiency | | (1,753,416.) |
|     Total | | $5,646,838. |

*Comments on Some Balance Sheet Items*

The following may be noted with respect to some of the balance sheet items:

(a) The accounts and notes receivable (net) in the amount of $1,545,047 were pledged by the debtor with Bankers Trust Company as collateral for current loans. Similarly, inventory stated at $2,976,094 was partly pledged.

(b) The estimated reduction of $405,694 (loss carry-back) in taxes due the United States arises out of the anticipated offset of losses in fiscal 1960 against taxes due.

(c) In June 1959, $1,500,000 face amount of 6% Subordinated Convertible debentures were issued under an indenture dated as of June 15, 1959, and sold to a group of underwriters headed by Ira Haupt & Co. for resale to the public.

Interest due June 15, 1959, was paid on July 15, 1959, within the grace period provided by the indenture.

The interest coupon due on December 15, 1960 was not paid. It may not reasonably be expected that this payment will be made within thirty days of the due date.

The filing of the Chapter XI petition and the debtor's admission of inability to meet its maturing obligations constituted a matured event of default under the indenture, which permits acceleration of the maturity of the debentures either by the indenture trustee or by debenture holders. No action has been taken under this provision.

*Debtor's Earnings Record*

The earnings record of the debtor since March 1, 1952, is as follows:

| Year Ended February 28 | Sales | Net Income (Loss) after Taxes |
|---|---|---|
| 1953 | $ 1,810,169 | $( 36,583) |
| 1954 | 4,337,362 | 82,803 |
| 1955 | 3,634,547 | 65,252 |
| 1956 | 5,322,152 | 27,692 |
| 1957 | 8,334,809 | 176,442 |
| 1958 | 10,111,254 | 166,063 |
| 1959 | 10,491,781 | 185,781 |
| 1960 | 8,164,747 | (2,008,594)* |
| Mar. 1—Aug. 15/60 | 3,057,218 | (1,029,727)** |

*The History of the Debtor's Working Capital Stringency*

Since 1955, the debtor has been suffering from a continuing working capital stringency, although it has sold an aggregate of $2,400,000 of securities to the public.

In 1955, it sold shares of common stock to the public for $300,000.

In 1957, it sold shares of 6% convertible preferred stock to the public for in excess of $600,000.

The net proceeds to the company in each case was applied as additional working capital.

During the same period, short term borrowings commenced by the debtor and by its subsidiaries.

In 1959, the proceeds of the sale of $1,500,000 of convertible debentures was used largely to repay notes and to add to working capital.

*Secured Loans by Bankers Trust Company*

Early in 1960, the debtor entered into a financing arrangement with Bankers

Trust Company pursuant to which the bank took over certain outstanding indebtedness and then made substantial loans to the debtor and its subsidiaries secured by pledge of accounts receivable and inventory. At the date of the filing of the Chapter XI petition, the amount due Bankers Trust Company exceeded $2,509,500.

*Rise in Interest Charges Paid by the Debtor*

Increased borrowings for working capital were reflected in the rise in interest charges paid by the debtor. In the fiscal year ending February 28, 1957, interest charges amounted to $50,857. Such interest charges increased to $93,197 in fiscal 1958; $197,436 in fiscal 1959; and $364,953 in fiscal 1960. During the period March 1, 1960 to August 15, 1960, interest charges aggregated $184,878.

*Additional Loans During the Chapter XI Proceeding*

Operations by the debtor during the Chapter XI proceeding could not continue without further financing. Pursuant to orders entered by the Referee in Bankruptcy in the Chapter XI proceeding, the debtor has incurred additional borrowings from Bankers Trust Company for operating purposes.

*Some 1960 Figures of Operating Loss*

The unprecedented operating loss of more than $2,430,000 in the fiscal year 1960 has been attributed by the debtor to the following factors: (1) high cost of consolidating the operations from nine scattered plant locations to the single Yonkers plant without interrupting the level of production; (2) labor strife which lowered efficiency; and (3) the 1959 steel strike.

*Continuing Difficulties Despite Abatement of Adverse Factors*

Although the conditions allegedly leading to the debtor's financial difficulties have abated, the difficulties themselves have continued.

The debtor's operations have been completely consolidated for at least one year with no manifestation of increased efficiency.

Anticipated economies from single plant operations have not been realized.

There has been no recent lack of availability of steel since the end of that strike.

A settlement with the employees' union has restored labor harmony.

*Representation of Various Interests*

Unsecured creditors, including debenture holders, have been represented in the Chapter XI proceeding by the law firms of Levy, Levy & Ruback and Leinwand, Grossman, Mandelbaum, & Maron.

At or about the time of the filing of the Chapter XI petition, the two law firms had been retained by trade creditors to represent their interests against the debtor in the proceeding.

In addition, through a series of communications initiated by or on behalf of Ira Haupt & Co., principal underwriter for the debtor's debentures, Levy, Levy & Ruback received a number of authorizations from debenture holders and from brokers on behalf of debenture holders to represent them. Levy, Levy & Ruback claim to represent the holders of over $150,000 of debentures, substantially all of which representation resulted from the foregoing activities.

On or about October 7, 1960, an official creditors committee was appointed, consisting initially of representatives of trade creditors. Provision was made for a group of minority members to consist of debenture holders. Thereafter, seven debenture holders or representatives of debenture holders were added to the committee. The committee is represented by Levy, Levy & Ruback and Leinwand, Grossman, Mandelbaum & Maron.

*Necessity for Reorganization of the Capital Structure Under Chapter X*

The debtor's financial condition and history make it clear that a reorganization of the capital structure will be required in order fully to effect its rehabilitation. The patent lack of working capital alone indicates the need for substantial investment of new capital, if the

enterprise is to continue. It is beyond speculation that such investment would in turn depend not only upon an arrangement with unsecured creditors but upon a thorough recasting of the debtor's capitalization and the realignment of management. Of the rehabilitation chapters of the Bankruptcy Act, only Chapter X provides the means for effecting such complete result.

*Additional Factors Indicating Applicability of Chapter X*

If solution of the debtor's problems were attempted, without more, by a composition of its unsecured indebtedness, including the debentures held by the investing public, a substantial question of fairness to debenture holders would be presented. Such a step would involve the continuance of the interests of junior classes, the preferred and common stockholders, while reducing or deferring the creditor claims of public security holders.

The "fair and equitable" standard embodied in Chapter X, together with the machinery provided in that Chapter, assures that the "absolute priority" rights of public creditors will be preserved.

Chapter XI, in providing merely that the arrangement be in the "best interests of the creditors," assures no such preservation of rights.

*Other Factors Indicating Applicability of Chapter X*

Unlike Chapter XI, Chapter X provides adequate means for a disinterested analysis in order to provide the court, the parties and the creditors and stockholders with a basis for the exercise of an informed judgment as to the fairness and feasibility of reorganization proposals.

Chapter X provides various safeguards for this purpose for all those interested in a debtor.

Where, as in this case, the liabilities exceed $3,000,000, the court must refer plans deemed worthy of consideration to the Commission (11 U.S.C.A. §§ 572, 574). If, thereafter, the plan is found to meet statutory standards, it is submitted to all interested parties for their acceptance or rejection, accompanied by the Commission's report, if any, and by the court's opinion approving the plan (11 U.S.C.A. § 575).

*Other Safeguards Provided in Chapter X*

Other statutory safeguards are provided in Chapter X for the protection of investors which are omitted from Chapter XI. See 11 U.S.C.A. §§ 579, 598, 611, 616(11), (12) (b) (2), 621.

## VI.

### Conclusions

*As to the S.E.C.'s Motion to Intervene*

The rights, powers, privileges and duties of the Commission under Chapter X are set forth in title 11 U.S.C.A. §§ 572, 575, 608, 665, sub. a.

The Commission's interests are not represented in this Chapter XI proceeding nor are the interests of the public investors adequately represented by any party to this proceeding. The financial history and condition of this debtor demonstrate the need of these parties for representation unrelated to any other interests in the debtor.

■ The adequate representation of these interests requires that the Commission be permitted to intervene for the purpose of taking all such steps as may be appropriate for their protection in this proceeding.

*As to the Motions to Dismiss*

■ ■The debtor's petition has been improperly filed under section 322 of Chapter XI of the Bankruptcy Act (11 U.S.C.A. § 722). Chapter XI does not apply and is not available to a debtor corporation with publicly held securities and where there is need for a thoroughgoing reorganization and recasting of the corporation's capital structure. Effective rehabilitation can be accomplished only by such reorganization. If such corporation desires to adjust its obligations under the provisions of the Bankruptcy Act, it must seek relief under Chapter X.

In the circumstances, no fair and equitable arrangement affecting the debtor's unsecured creditors alone (such as is

prescribed by Chapter XI (11 U.S.C.A. §§ 706(1), 707(1, 2), 756, 757(1), 762) can be consummated in the present Chapter XI proceeding.

■ The rehabilitation needs of this debtor will encompass more than merely a simple composition of its unsecured debts. The provisions of Chapter XI permit only a composition of the indebtedness of unsecured creditors. Any other steps needed to complete the debtor's rehabilitation are unavailable under Chapter XI.

Chapter XI does not confer upon the Court powers adequate to cope with the needs of this debtor. If, as the debtor suggests, a merger is to take place as part of the rehabilitation process, it could only be effectuated outside the aegis of the Court, through the medium of stockholder action.

■ Any arrangement or composition of the debtor's unsecured indebtedness, without more, would result in a failure to comply with section 366 of the Bankruptcy Act [11 U.S.C.A. § 766]. Since a substantial question of fairness to debenture holders would be presented by such an arrangement proposal, it would not be proposed or made in good faith as required by section 366 and would not receive the confirmation of this Court.

Unless the Chapter XI proceedings are dismissed, the interests of investors in this proceeding will be improperly affected. Moreover, the Commission would be denied the rights, powers and privileges conferred on it by Chapter X; and it would be prevented from performing its duties under Chapter X.

The S.E.C.'s motion for leave to intervene is granted, as prayed for.

The Court grants the motions to dismiss this proceeding unless—within such time as will be fixed by this Court upon the settlement of the order herein—the petition is amended to comply with the requirement of Chapter X for the filing of a debtor's petition or a creditors' petition under Chapter X is filed.

Settle orders on notice.