594

**In the Matter of PEOPLES LOAN & IN-
VESTMENT COMPANY, Debtor.**

**Civ. A. No. FS-68-B-15.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Nov. 7, 1968.

Ball & Gallman, Fayetteville, Ark., Franklin Wilder, Fort Smith, Ark., for bankrupt or debtor.

Warner, Warner, Ragon & Smith, Fort Smith, Ark., for creditor Jake, Jr., and Millie Partlow.

William M. Stocks, Fort Smith, Ark., for Richmond Life Ins. Co.

Dickey, Kennon, Lamm & Wilde, Tulsa, Okl., for respondents Jimmy J. Ryan and Community National Life Ins. Co.

Charles A. Beasley, Fort Smith, Ark., for First National Bank of Fort Smith.

Warner, Warner, Ragon & Smith, Fort Smith, Ark., for Guardian Life Ins. Co.

Daily & Woods, Fort Smith, Ark., for IRVRU, Inc.

Lester & Schults, Little Rock, Ark., for State Bank Commissioner.

Joseph L. Grant, Chicago, Ill., for Securities and Exchange Commission.

Bradley D. Jesson, Fort Smith, Ark., for Committee of Depositors.

Bethell, Stocks, Callaway & King, Fort Smith, Ark., for Investors Thrift Corp.

## OPINION

WILLIAMS, *District Judge.*

On July 19, 1968, the Securities and Exchange Commission pursuant to Section 328 of the Bankruptcy Act, 11 U.S.C., Sec. 728 filed motion to dismiss Chapter XI proceeding unless, within a time specified by the Court, the debtor amends its petition, or a creditor's petition is filed, to bring the proceeding within Chapter X of the Bankruptcy Act, 11 U.S.C., Sec. 501 et seq.

Inasmuch as the Referee in Bankruptcy had already scheduled the first meeting of creditors for August 6, 1968, the motion was referred to the

Referee as Special Master to hear the evidence and testimony concerning it contemporaneously with the examination of debtor's officers at first meeting of creditors. The Special Master heard testimony and evidence on August 6 and 7, 1968, and conducted a further hearing on September 13, 1968. On September 18, 1968, the Special Master filed findings of fact and conclusions of law, and a recommendation that the motion of the Securities and Exchange Commission be denied.

The findings of fact and conclusions of law on this motion are not separately stated but are incorporated in this opinion as permitted by Rule 52, Fed.R.Civ. P. This also makes it unnecessary for the Court to deal with specific objections to the findings and conclusions of the Master. For clarity, Peoples Loan & Investment Company, is hereafter referred to as "Peoples" or "debtor" and Community National Life Insurance Company is referred to as "Community."

Debtor institutes this proceeding by a voluntary petition under Section 322 of the Bankruptcy Act, 11 U.S.C., Sec. 722 in which it sought to effect an arrangement by extension of its unsecured debts. The petition reflects that debtor is solvent with assets of $8.7 million and liabilities of $8.2 million. This circumstance is unusual, but debtor, for reasons that appear hereafter, alleged also that it was unable to pay its debts as they matured. Despite the rather substantial net worth of debtor its assets were composed, in general categories, of real estate mortgages maturing several years hence, cash, land, unmatured debentures, restricted and optioned common stock and miscellaneous personal property. Most of these assets are not readily convertible to cash and debtor faced immediate demands from depositors, the major unsecured creditors, for payment on their thrift certificates and pass book accounts.[1]

Prior to this proceeding and in order to protect against excessive depositor demands for payment, Peoples consented to an order in the Sebastian County Chancery Court, Fort Smith, Arkansas, upon application of the Arkansas State Bank Commissioner, which enjoined it from either accepting or paying out deposits. On May 16, 1968, a similar order was entered in this case and also an order was entered permitting debtor to remain in possession of its property, continue routine business and continue to conduct its affairs.

In addition to the arrangement proceeding involving a requested extension, or moratorium, on payment of depositors, Peoples has pursued causes of action to complete pending transactions and has instituted a suit involving a substantial portion of its assets.[2]

---

1. Debtor is an industrial loan institution that accepted deposits or issued thrift certificates at interest, usually 6%. During the period March 14 through March 27, 1968, it paid depositors upon demand more than $1,220,000.00 above deposits received. This run was due to publicity attending the receivership of Arkansas Loan and Thrift Corporation, a company completely unrelated to Peoples, instituted by the Securities and Exchange Commission for securities act violations and insolvency.

2. In P. L. & I. v. Community National Life Insurance Co., Civil Action No. FS-68-C-28, the relief sought is recovery of a judgment in an amount exceeding $3.0 million based upon recovery of $1.6 million for diversion of stock purchased by Peoples and $1.4 on a conditional commitment of Community to exchange first mortgages for stock in Peoples after Community acquired control of Peoples. Further relief concerns a take out commitment on AMCO Industries common stock and acts of other parties. Peoples also instituted, alternatively, against Community a proceeding in the summary jurisdiction for a turn over order for $1.6 million. A similar turn over in the summary jurisdiction was instituted against Richmond Life Insurance Company to recover 164,172 shares of common stock of Richmond. The latter two proceedings were brought on the theory that the parties held property of Peoples. A further petition against IRVRU, Inc., was filed by Peoples seek-

It is the contention of the Securities and Exchange Commission that the Bankruptcy chapters involved, X and XI, are mutually exclusive. As grounds for the utilization of Chapter X, it is asserted that there is evidence of mismanagement, need for readjustment of capital structure, the unresolved litigation arising from uncompleted transactions and self dealing by the debtor with its prior and present officers. Thus, it is claimed, the need for an investigation by an independent trustee under Chapter X, even with the additional time and expense involved, outweighs the speed and economy possible under Chapter XI.

Peoples commenced existence in 1923 as an ordinary business corporation under the laws of Arkansas with broad powers in its charter to engage in, among other things, the business of making industrial loans. It became regulated under the Arkansas laws relating to industrial loan institutions, and at the time of the proceeding it was subject to statutory provisions contained in the Arkansas Industrial Loan Institution Act.[3]

More recently Peoples loaned funds on "shell homes," i. e. those where the purchaser completes and finishes the inside of the house. These loans are secured by mortgages on the land and improvements and usually are repayable in installments over an extended period of time—10 to 20 years. American Home Builders, Inc., owned Peoples for a period of time and sold its shell home mortgages to Peoples. Commencing in late 1955 and until early 1967 Peoples purchased shell home mortgages from Markham Homes, Inc., while its half owner, Maurice Markham, was Chairman of the Board of Directors of Peoples. Peoples discontinued such practices upon notification from the State Bank Commissioner although such practices had been approved by the Commissioner as to dealings with American Home Builders, Inc.[4]

Various transactions by Peoples came under the scrutiny of the Arkansas Banking Commissioner and as a result of which certain directives were issued, and litigation involving these various transactions thereafter ensued. These various transactions form the basis of the claim of the Securities and Exchange Commission that a Chapter X proceeding is mandatory.

We are not here concerned with whether all the misdeeds of Peoples can be best exposed by a Chapter X proceeding, but whether under the facts as presently revealed the Court has a discretion to proceed with this cause as filed under Chapter XI of the Bankruptcy Act or whether it is required to dismiss the action pursuant to the motion of the Securities and Exchange Commission, unless the petition is amended by the debtor, or further petition is filed by a creditor, seeking relief under the provisions of Chapter X of the Bankruptcy Act. The Court has concluded that it has a discretion and that the motion should be denied.

ing to remove an option encumbering AMCO Industries common stock as an executory contract. All these matters are still pending.

3. Ark.Stats.(1947) § 67–1001 et seq. Each institution is regulated by the State Bank Commissioner, subject to examination, including affiliates, and the Commissioner is charged with insuring safe and conservative management of the institutions. § 67–1008. The act requires cash reserves of 15% of the indebtedness, § 67–1013, and loan limit is 20% of the actual paid in capital and surplus § 67–1006.

4. When Investors Thrift Corporation acquired Peoples, American Home Builders, Inc., and other related corporations in 1965 the State Bank Commissioner at that time furnished a letter indicating that Peoples was in compliance with all laws and regulations applicable to it. At that time it had many mortgages from American Home Builders, Inc., in its portfolio. A similar letter was furnished by the Arkansas Securities Commissioner, an official of the State Bank Department, as well as the Arkansas Insurance Commissioner with reference to American Service Life Insurance Company, an affiliate.

Two separate series of transactions must be discussed. The first involves AMCO Industries and the second involves what we refer to collectively as the transaction with Community National Life Insurance Company, Tulsa, Oklahoma.

In 1966 Peoples purchased a hotel and office building in Los Angeles, California. Its total investment was $450,000.00 plus assumption of first mortgages. Peoples formed subsidiaries to hold title to these properties and made loans to the subsidiaries to improve the properties. Peoples sold these properties to AMCO Industries and took in exchange for its equity a debenture for $1.0 million, convertible into common shares of AMCO Industries. Ultimately, to enable new management to take over AMCO Industries and because of its precarious financial condition, Peoples accepted in settlement of disputes with AMCO Industries 150,000 common shares of AMCO Industries subject to an option to IRVRU, Inc., the new management, at $5.00 per share until August 31, 1969 and at $6.00 per share until June 30, 1970. This option Peoples now seeks to reject. It also seeks to remove the investment legend from the stock so that it will be free trading and can be sold immediately by obtaining a "no action" letter from the Corporate Finance Division, Securities and Exchange Commission.

Although Peoples showed on its books that its funding of the California subsidiaries were loans, it is obvious that this was nothing more than additional investment. In any event, the net result to Peoples was that at the sale to AMCO Industries, Inc., of the hotel and office building it had a potential profit of more than $522,000.00. Coupling a retained one-half interest in the office building valued at $150,000.00, even though this value is doubtful, Peoples has received assets worth $900,000.00 in exchange for its interest in the hotel and for one-half interest in the office building.

The common stock of AMCO Industries, Inc., with IRVRU, Inc., management has continuously traded at more than $7.00 per share reaching a high of $12.00, and it appears that this investment in AMCO Industries, Inc., may be a sound and valuable asset of Peoples. Should the executory contract be rejected, then Peoples will be able to obtain more than $1.5 million by sale of its AMCO Industries, Inc., at the present market of more than $10.00. Of course, IRVRU, Inc., would be entitled to participate here as a common unsecured creditor for the value of its option at the time of rejection.

The transactions with Community National Life Insurance Company of Tulsa, Oklahoma, are more complex. As requested by the Arkansas Bank Commissioner, Peoples sought to rid its portfolio of mortgages obtained from Markham Homes, Inc. Shell home mortgages cannot be disposed of at par, there being more risk attendant upon them than the usual mortgage where the owner has a substantial equity or the lender is insured by the Federal Housing Administration or the Veterans Administration.

Initially Peoples obtained from Community a take out commitment on the AMCO Industries, Inc., common stock so that in the event the options of IRVRU, Inc., were not exercised, Community would be compelled to buy at the option expiration date at $6.00 per share. Community desired to divest itself of control of Richmond Life Insurance Company where it held approximately 164,271 shares of Richmond common stock. It was agreed that Peoples would sell to Richmond mortgages from its portfolio in an amount of $1.6 million which funds would be utilized by Peoples to acquire the Richmond stock at the same total price.

As a condition to the commitments made to Peoples, it was further required that Investors Thrift Corporation sell to Community for the sum of $600,000.00 its controlling interest in

Peoples. All other commitments were precedently conditioned on this acquisition by Community and all commitments were inter-dependent.

Peoples characterized its acquisition of the Richmond stock as a loan on its books, but the testimony clearly indicated that its nominee, one John Haldi, was to operate Richmond and that there was essentially a guarantee from Peoples on the Richmond stock as Community committed itself to purchase a note collateralized by the Richmond stock, such note being given by Haldi to Peoples. It therefore appears that rather than a loan to John Haldi the transaction was merely the acquisition of the stock by Peoples in his name. It constituted an investment and not a loan. The sale of mortgages to Richmond for $1.6 million and the purchase of the Richmond stock was consummated.

Peoples found that the Arkansas Bank Commissioner objected to Peoples acquisition of control of a life insurance company in another state and sought a means to dispose of it. It entered into a contract with Midwestern Investment and Land Company, Joplin, Missouri, whereby Midwestern would exchange a $2.2 million wrap around note, secured by certain hotel properties, to Peoples for the Richmond stock. While this contract was completely executory, it was agreed between Peoples, Midwestern and Community that Midwestern would be placed in control of Richmond. Ultimately, Peoples rejected the deal with Midwestern because of the low value of the hotel and the fact that the income was inadequate to produce sufficient cash flow to retire the note. Additionally an error had been made in computing the amount necessary to amortize the note, the total annual payments required by the note barely paying the interest and not retiring any principal.

But as a result of the agreement for control by Midwestern and the executory contract of sale between Peoples and Midwestern, coupled with the consent of Community, Midwestern obtained issuance of the Richmond stock

to itself and continued the operation of Richmond.

Another agreement between Community and Peoples contemplated that Community, after it acquired control of Peoples from Investors Thrift Corporation, would transfer first mortgages to Peoples in exchange for stock. Peoples was to receive $1.4 million for stock at $3.23 per share.

Prior to the performance date of any of the Community commitments, the Arkansas Bank Commissioner instituted the receivership proceeding in the state court and Peoples acceded to an injunction suspending the deposit and payout function of Peoples. This proceeding was instituted by Peoples shortly thereafter. Peoples then instituted suits to compel Community to respond in damages and carry out its commitments.

Peoples and Community during the pendency of this litigation have negotiated for a settlement. The net effect of the Community-Peoples transaction was to remove from Peoples mortgages in the amount of $1.6 million. This represents about one-fifth of the assets of Peoples and is vitally important to the feasibility of any plan of arrangement or any continued operation of Peoples. Incidentally, it is apparent that public attitude at Fort Smith, Arkansas, militates against any further banking functions of Peoples that involve acceptance of deposits. The massive publicity attending Arkansas Loan & Thrift Corporation as well as this institution clearly indicates that repayment of the depositors in an orderly fashion, as quickly as possible, without disturbing the debtor except to the extent necessary, is the most desirable course of proceeding. Peoples itself must, until public confidence is again present, operate most circumspectly, devoting its entire energies to realization on its assets through reduction operations and conservation measures.

It seems most obvious that settlement of the Community-Peoples litigation must also achieve for Peoples some

guarantee that a repayment plan for the depositors will be carried out.

On September 13, 1968, Peoples and Community settled, subject to approval of this Court, its litigation upon the following terms:

(1) Community will place in Peoples admitted assets to the extent of $1.6 million with such assets to be approved and selected by the Creditors Committee in this proceeding.

(2) Community will perform through Peoples a plan of repayment spanning five years with an initial payout of 10% on all deposits with depositors permitted to draw, at their option, during such five year period on their accounts at reduced valuations commencing at 50% on January 1, 1968 and rising to 110% at the end of five years.

(3) People will transfer stock voting control to Community by issuing authorized but unissued stock at $1.00 per share for a total of approximately $59,-000.00.

(4) Community will constitute the board of directors of Peoples so that it has three members on such board and the Creditors Committee has two members.

There is some dissent by Investors Thrift corporation to this settlement, but it appears that debtor, in its own way, or Community can handle these disputes. Among other things the Creditors Committee will assume a degree of responsibility in future operations of Peoples approving all loans made, other than on sale of repossessions.

There are many other details of the plan of arrangement which enure to the benefit of the creditors in return for the extension of their debts, such as new management by Community and loans available on deposits but the overwhelming advantage to the depositors is the acquisition by Peoples of sound assets in place of shell home mortgages which it held in the first place.

We note that Community through its counsel has indicated in Court that it will settle if a Chapter XI proceeding remains in effect and that it will perform its agreement in the settlement but that, on the other hand, if Chapter X is utilized it will not settle but will litigate. It is further noted that in the settlement the rights of Peoples, if any, against Midwestern and Richmond are dismissed, and Community is left to seek its own remedies against them in order to recover for the loss of the Richmond stock. Community is an insurance company with reported assets near $20 million and a net worth reportedly exceeding $5.0 million. Thus it is a strong economic force for use in Peoples rehabilitation.

Before discussing the law applicable to this problem, we must advert to the procedures undergone in this proceeding. Although S.E.C. was apprised at the outset of these proceedings, as well as conducting its own investigation and being kept abreast of the proceeding as it went along, the Securities and Exchange Commission did not participate in these proceedings until July 19, 1968, when it filed the present motion. The matter has already been referred to the Referee in Bankruptcy, and he has appointed a Creditors Committee which sought to go into debtors affairs and participate thereafter in the attempt of Peoples to settle the disputes with Community. On August 2, 1968, the motion of the Securities and Exchange Commission was referred to the Referee as Special Master to hear the evidence, file a report and recommend upon the disposition of the motion. The motion hearing as well as the first meeting of creditors was held on August 6 & 7, 1968, when the Referee heard evidence and testimony. Counsel for the Creditors Committee participated in the hearing and filed a recommendation that the motion of the Securities and Exchange Commission be denied so that debtor could realize on the settlement with Community; and also recommended approval of the plan of repayment proposed as an integral part of the settlement of the Community-Peoples litigation.

The Referee filed an extensive report recommending that the motion of the Securities and Exchange Commission be

denied. We have reviewed heretofore most of the evidence and testimony received by the Referee, and note that he also had the advantage of proposed findings, conclusions and discussions of the decision from all interested parties. It is apparent that the Creditors Committee and its counsel have been most diligent and have listened to many proposals for a plan of arrangement and have concluded that the present proposal is the best obtainable. There is only one class of creditors, the depositors and thrift certificate holders, who are affected by the plan, and their interests are the only substantial interest affected by this proceeding. All of the matters asserted as dictating a Chapter X proceeding were voluntarily disclosed by debtor. All the evidence at the hearing on August 6 & 7, 1968, before the Referee, was produced by the debtor. Its officers testified about the transactions challenged by the Securities and Exchange Commission and their testimony was not contradicted. Indeed, Peoples made a full disclosure of its affairs, and it is doubtful that further investigation would be productive. There was an absence of any evidence of consequence from S.E.C. the moving party.

There is no question concerning the jurisdiction of the Court in this proceeding inasmuch as Peoples is a corporation entitled to the benefits of the Bankruptcy Act. It is further apparent that the Securities and Exchange Commission is specifically authorized by Section 328 of the Bankruptcy Act, 11 U.S.C. § 728, to make motion to dismiss.

The problem is the application of what appear to be simple rules to the facts of this individual case. On the one hand Chapter XI provides speed and economy in resolving the difficulties of debtor, and on the other the independent trustee utilized by Chapter X provides thoroughness, disinterestedness and requires more expense and time than Chapter XI.

Under Chapter X it is of course necessary that it be shown that the relief necessary for debtor is not available under Chapter XI. While Chapter XI and Chapter X are mutually exclusive,[5] and it may be said that certain considerations militate toward Chapter X such as evidence of mismanagement,[6] more than minor readjustment of public debt[7], a large amount of public debt exists,[8] the trustee under Chapter X is necessary,[9] or debtor may over reach the holders of debt,[10] still these are not absolutes but merely preferences or presumptions that furnish a guideline for the Court in exercising its discretion.

As stated in General Stores Corp. v. Shlensky, supra, the test of which chapter to use is whether, on the facts of the case, the formulation of a plan under a disinterested trustee and the protective provisions of Chapter X would better serve the public and private interests concerned, including those of the debtor. 350 U.S. at page 466, 76 S.Ct. at page 519 the Court further says:

"A large company with publicly held securities may have just as much need for a simple composition of unsecured debts as a smaller company, and there is no reason we can see why c. XI may not serve that end. The essential difference is not between the small company and the large company but between the needs to be served."

In SEC v. Crumpton Builders, Inc., supra, it is said:

"A bankruptcy court has a broad range of discretion; it is a court of equity and it must exercise its mandate and use its analytic tools to make such that

5. SEC v. American Trailer Rentals, 379 U. S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965).

6. General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956).

7. SEC v. American Trailer Rentals, supra.

8. SEC v. Canandaigua Enterprises Corp., 339 F.2d 14, 19 (CA 2 1964).

9. SEC v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

10. SEC v. Crumpton Builders, Inc., 337 F.2d 907, 912 (CA 5 1964).

the Bankruptcy Act, as a whole, is used for equitable purposes for which it was intended."

██ As said in Grayson-Robinson Stores, Inc. v. SEC (CA 2 1963), 320 F.2d 940, the judge may properly look at what has already been done by debtor and at what may be done in the future in determining whether the benefits of Chapter X investigation will outweigh the detriments of a transfer to that chapter. Further, in SEC v. Liberty Baking Corp. (CA 2 1957), 240 F.2d 511, 516, it is clearly indicated that a plan of arrangement under Chapter XI may just as well satisfy the requirements of Chapter X and be just as favorable to creditors and the arrangement should not be disturbed because it was reached by Chapter XI proceedings.

Judge Herlands, who encountered this same problem In re Herold Radio & Electronics Corp. (DCSDNY 1961) 191 F.Supp. 780 at pages 783–784 expressed his concept of the problem as follows:

"A measure of 'sound discretion' and 'business' judgment resides in the Court in deciding these motions. * * This discretion has been described as 'within the purview of the district court's discretionary exercise of its equity powers.' * * * Like all judicial discretion, it is a discretion that 'must be a legal discretion, rather than one merely at will' * * * or one that simply expresses the court's 'own notions of equitable principles.' "

"Discretion that is premised on the wrong criteria or that disregards well-settled principles is said to transcend 'the allowable bounds' and is reversible."

"The problem is not one of absolutes. The approach is not monolithic. It is pluralistic—evaluating the aggregate of circumstances in accordance with the guiding criteria expounded by the Supreme Court."

Thereafter he enumerates exemplary questions to be considered and in concluding said that:

"The answer to no one single question is necessarily decisive. All of the sample questions suggest the breadth of the field to be canvassed. The breadth of the inquiry forecloses a solution by mechanically applying a rigid formula."

██ It is suggested by the Securities and Exchange Commission that the past acts of management in the AMCO and Community transactions furnish enough to dictate that Chapter X is the only available remedy for debtors problems. While management's derelictions are to some extent explainable by a short term in office, late 1965 to August 7, 1968, the problems it found and the pressure of its regulatory agency, they cannot be overlooked. Even with such a problem, prudence would have dictated more caution and safeguards than management used to preserve its assets. Nevertheless, Peoples was not injured by the AMCO transactions but rather benefited, and it appears that the Community affair can be remedied to the benefit of the depositor creditor. Conceding that management is to blame to a large extent for the legal problems of debtor regarding Community, the provisions of the plan of arrangement providing, for new management would seem to answer this problem. Further, an active Creditors Committee and its counsel participating in the business affairs of Peoples during the plan would seem to adequately safeguard Peoples from a recurrence of this problem. It is noted that on August 7, 1968, the Referee placed a supervising receiver in charge of Peoples at the request of the Securities and Exchange Commission and that thereafter the chief executive officer of Peoples, Mr. Maurice Markham, whose acts are at issue here, was relieved of his duties and no longer directs or participates in Peoples affairs.

While Community has made its offer of settlement contingent upon this proceeding remaining in Chapter XI this is not considered unreasonable. Community's commitments envisioned that Community would control Peoples before Peoples could realize upon the mortgage

commitment and benefit from Community's ownership. Community will be able to carry out the plan of arrangement by reason of its assets and ability to utilize assets of Peoples to produce revenue for payment of depositors. Furthermore, its agreement to perform the plan of arrangement is an extremely fortunate assurance to the depositors. It would be extremely unlikely that Community would be interested in Peoples or its assets or its depositors after the expiration of the investigatory and report period of Chapter X, not to mention the sure and certain expense involved. It is expected that Community would want to reevaluate its position after the Chapter X proceeding and not before. Therefore, the condition on the settlement is important in a consideration of this motion. While this court will not be persuaded by conditions attached to the settlement that violate the law or the notions of equity that prevade this determination, it cannot overlook that the in hand settlement with Community will provide to depositors assets in the amount of $1.6 million that otherwise must be litigated. A reasonable estimate of the time involved in litigating a suit of this magnitude would certainly span several years. Outcome of any litigation is not fully predictable and settlement on acceptable terms is always prudent, business wise. But here the formulation of any full plan of repayment of the depositors would also await the determination of that litigation. Should the litigation be lost, and there are certain apparent and possible defenses to the litigation in its entirety, the depositors will be irreparably harmed. It seems that repair of Peoples assets coupled with competent management and the strong economic backing of Community will immeasurably benefit the depositors. There is no reason to doubt Community's resolve to litigate this case absent an arrangement of the unsecured debt that will preserve Peoples and permit some chance of success in solving debtors problems.

The interest of Community in seeing that speed and economy are kept at the forefront are also understandable because Community by reason of its imminent stock ownership in and control of Peoples has an economic stake in Peoples.

It is suggested that Peoples needs to have its capital structure changed and that this might furnish an answer to the ills of debtor. In the first place it is noted that under the plan of arrangement the debtor has voluntarily changed its capital structure to the extent of selling controlling shares, about 22% equity, to Community. Peoples also plans a complete change out of its Board of Directors to comply with the provisions of the plan of arrangement. If there are any changes to the capital structure that can recoup for the depositors the assets in litigation with Community such changes have not been suggested. To believe that additional stock can be disposed of with that litigation pending and the community climate existing adversely to Peoples is to disregard the basic facts of this case. Peoples must housekeep for a while and repay its depositors before it can become a viable business and this is a proper function of Chapter XI of the Bankruptcy Act. Also, it is unrealistic to ask depositors to accept any stock in payment of their deposits.

In considering the plan of arrangement, as we must in order to see whether it is feasible and fair, it is apparent that a bank or similar institution, such as Peoples, simply cannot satisfy, on short notice, without other sources of cash, demands of all depositors for immediate payment. Here the assets are largely unconvertible without substantial loss, to cash on a short term basis. It therefore appears without much doubt that an extension of depositor creditors will be required in any plan of repayment. Peoples proposes to distribute about 60% of its available cash to depositors immediately, repaying 10% of all deposits. It then will value the 90% balance of each deposit at 50% with the value increasing at ⅝th of one percent per month. At the end of the five year period 10% will be added as a bonus for

the amount any depositor leaves on deposit during the plan. Depositors can withdraw at quarterly intervals. There are provisions for acceleration of payment to depositors in the event of realization on assets. The depositors creditors in exchange for the extension will receive membership on the board of Peoples and will further have veto power over any proposed investment of debtor other than those where loans are made in disposing of repossessed property and, as pointed out earlier, depositors have assurance of performance of the plan by reason of the participation of Community. This plan achieves some degree of fairness, because with the power of the creditors to control investments they can insure themselves priority over shareholders and by reason of their participation on the Board of Peoples can see that no payments are paid to stockholder prior to them. Peoples filed an original plan proposing a short period of repayment of the depositors but this was subsequently amended to an 11 year period of repayment of 10% per year. In early July, 1968, the Court ordered debtor to submit an accelerated plan of repayment when it became evident that it was possible for the litigation between Community and Peoples to be resolved. The current play of arrangement is vastly superior to that originally proposed, or as amended, and results to some large extent from the participation of the creditors committee and its counsel.

▮ It is difficult to see, if we are concerned about the litigation difficulties of Peoples and the other items brought to the Court's attention in the hearing, just exactly what a Chapter X proceeding could accomplish. Peoples' position in the AMCO and Community transactions appears fairly clear. The airing of Peoples' position in the AMCO and Community transactions appears fairly clear. The airing of Peoples' affairs was rather full and there is no suggestion that any-

thing remains to be uncovered. At least we are furnished no new evidence of indiscretions except those the debtor revealed in this Court. The needs and interests of the depositor creditor in obtaining assets for Peoples from Community far outweighs any academic exercise with an independent trustee. The necessity for a strong outside company to come in and assure the depositors of repayment in full, even though over a rather long period, also militates against a Chapter X proceeding where that may not be possible. Assuming that a Chapter X proceeding did disclose some further evidence of rights of People against its officials these remedies can still be pursued under the plan of arrangement, as such rights are preserved.

The creditors affected by Peoples' plan of arrangement are of one class, all unsecured and consisting of depositors on passbook accounts and holders by purchase of thrift certificates. Both of these securities paid interest at 6% per annum. The approval by the Creditors Committee of the plan of arrangement as well as the proposed settlement with Community exhibits its understanding of the fact that the debt must be extended under any plan and that the entry of Community into the picture enhances the prospect of full repayment. There is the further circumstance that debtor unofficially and informally distributed the eleven year plan asking for creditor acceptance. The alternative in that plan was liquidation, nevertheless the response, while not controlling here, indicates [11] a general depositor desire for a reasonable payout period and certainly is evidence that depositors understand the situation faced by Peoples and themselves in this matter.

The main problem here is repair of the asset position of Peoples. Over one-fifth of the assets of Peoples is involved in litigation in one law suit in this Court. If that item is disregarded then the

11. Total dollar amount voting was $3,835,-632.98. Total depositors voting for 50% payout or 11 year payout was 1,271 representing $3,459,295.44 or 90% of those voting. Some 92% of those voting for the plan wanted the eleven year payout option.

prospect for payment of the creditors of Peoples appears dim. Peoples is able to achieve a fair and equitable settlement with Community and retrieve better assets than it lost achieving a positive net worth for Peoples. Subjecting Peoples to the Vagaries of a Chapter X proceeding, even if the Court thought it desirable or necessary, would be unwise and detrimental to the interest and needs of everyone concerned because the opportunity for settlement with Community would be gone. There is no other known person or group of persons, who would be interested in Peoples, other than Community, and this exception exists only because the litigation settlement is mutually advantageous to Peoples and Community. Movement of this proceeding into Chapter X would be violently disruptive and would permit Community to litigate with Peoples at its leisure.

In view of the strong community feeling against industrial loan institutions there must be a housekeeping period before Peoples or any other such institution,. can become accepted businesswise. Any plan of arrangement contemplating payment of depositors without full liquidation will require outside help. Community reportedly has adequate assets and cash flow to warehouse assets, convert assets at the appropriate time, and produce income from the assets in order to make the depositor pay out. Absent resolution of the litigation and the entry of a strong outside force to help the depositors face bleak prospects for payment in full over any reasonable period of time.

The agreement settlement and the plan of arrangement filed by the debtor will achieve these results:

1. Old management will be replaced, or has already been replaced, so that the alleged acts of mismanagement will not be repeated and there still remains for resolution the right of Peoples against its prior officers and directors.

2. Equity ownership of about 22% will be in Community as well as voting control furnishing a strong incentive to Community to perform the plan of arrangement as it has agreed to do in the agreement of settlement.

3. Peoples operations will be subject to the scrutiny of, and participation by, an active and aggressive Creditors Committee through membership on the Board of Peoples and veto power over investments other than in disposition of repossessions. Furthermore, Peoples cannot distribute anything to the stockholders until creditors are paid in full and this can be implemented by the Creditors Committee. There is only one class of creditor in Peoples, the depositor, which will be affected by the arrangement and secured creditors rights are not overly burdensome or large compared to this class of creditor. It is true that priority claims and small trade accounts would be paid in full under the plan of arrangement but again these are not large or consequential in the overall picture.

4. The agreement of settlement is advantageous to creditors of Peoples as the Creditors Committee can pick and choose among the assets of Community securing better and sounder assets than the shell home mortgages parted with in the origination of the Community-Peoples transaction.

5. Features of the plan arrangement that commend it under the circumstances, as beneficial to the depositors are the immediate payout at 100% on the dollar to the extent of 10% of each and every account, thus relieving the immediate needs of many depositors. Further permitting withdrawals at quarterly intervals will enable those with recurring needs to obtain funds on a discounted basis without surrendering their whole account. Also the provision that permits a depositor to borrow up to 50% on any account at interest should be helpful to the depositors in enabling them to await the fruition of the plan over the 5 year period. Adequate arrangements are made in the plan for emergency situations of the depositors. There are provisions for accelerated payout as agreed by the Creditors Committee and Peoples if this is possible. It must be accepted

that there is no immediate panacea for the depositor's problems but early and prompt action in repaying them is mandatory. No institution of this type could pay out immediately at 100% all liabilities to depositors. Depositors seem to have accepted this fact.

7. Although fairness and strict priority is not necessary under Chapter XI as contrasted with Chapter X plan, still here the plan of arrangement measures up to a Chapter X plan. Debtor has sought at every step in the proceeding to insure that depository achieved strict priority above stockholders so that they are paid first. Feasibility of the plan appears beyond question considering the income generated by the mortgage and collections of Peoples and the entry of Community into the operations of Peoples with its reported assets and experience.

The Court considers that the plan of arrangement should be submitted to the depositors for their consideration because of the advantages afforded to such depositors.

An order will be entered denying the motion of Securities and Exchange Commission this 7th day of November 1968.