410 F.2d 851
 In the Matter of PEOPLES LOAN & INVESTMENT COMPANY OF FORT SMITH, Debtor.
SECURITIES AND EXCHANGE COMMISSION, Appellant,
v.
PEOPLES LOAN & INVESTMENT COMPANY OF FORT SMITH, Debtor,
Creditors' Committee of Peoples Loan and Investment Company, Intervenor.
 No. 19567.
 United States Court of Appeals Eighth Circuit.
 April 23, 1969.
 
 Paul Gonson, Asst. Gen. Counsel, S. E. C., Washington, D. C., for appellant; Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Solicitor, J. Kirk Windle, Special Counsel, and Joseph L. Grant, Atty., S. E. C., Chicago, Ill., with him on the briefs.
 James W. Gallman, of Ball & Gallman, Fayetteville, Ark., for appellee; E. J. Ball, Fayetteville, Ark., and Franklin Wilder, Fort Smith, Ark., with him on the brief.
 Bradley D. Jesson, Fort Smith, Ark., for intervenor, Creditors' Committee for Peoples Loan & Investment Co.
 Before GIBSON, LAY and HEANEY, Circuit Judges.
 FLOYD R. GIBSON, Circuit Judge.
 
 
 1
 The Securities and Exchange Commission, pursuant to § 328 of the Bankruptcy Act, 11 U.S.C. § 728 intervened in this Chapter XI Bankruptcy proceeding and moved the District Court for an order dismissing the Chapter XI proceeding unless the petition be amended by the debtor to comply with the requirements of a Chapter X proceeding. The basis of the motion was that only a Chapter X proceeding would provide the proper method for protecting the public debt holders (depositors) of the debtor. The District Court denied the motion on the basis that a proposed arrangement for scaling down amounts owed depositors with a payout over a five-year period was in the best interest of the unsecured creditors holding the public debt.[1] The Securities and Exchange Commission duly appealed and requested a temporary injunction from this Court restraining further proceedings including the adoption of a proposed plan of arrangement for the unsecured debt. The injunction was granted by us and is in force pending a hearing on the merits of this appeal.
 
 
 2
 A bankruptcy court is a court of equity and is guided by equitable doctrines and principles. 11 U.S.C. § 11; Securities and Exchange Commission v. United States Realty & Improvement Company, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940). We reverse and remand because we think the proper application of equitable principles enunciated by the Supreme Court in controlling cases commands the employment of a Chapter X proceeding in the factual situation of the debtor. The Congressional scheme for the relief of financially pressed debtors and the protection of creditors enacted as Chapter X and Chapter XI of the Bankruptcy Act sets forth mutually exclusive proceedings and places the burden on the Court and not the debtor to select the proper proceeding.
 
 
 3
 In our opinion the factual situation disclosed by the record shows that a Chapter XI proceeding is too limited to provide adequate relief to the public debt holders and calls for the application of the more extensive and adequate safeguards of a Chapter X proceeding.
 
 
 4
 To evaluate the proper application of the bankruptcy statutes and its equitable doctrines and principles to the debtor's overall financial position and the rights of all interested parties, including in particular those of the unsecured public debt creditors, it is necessary to relate in some detail the composition, background and operation of the debtor.
 
 
 5
 The debtor, Peoples Loan and Investment Company,[2] was organized in 1923 as an ordinary business corporation with certain lending powers. It became subject to state regulation about 1940 under the Arkansas Loan Institution Act, Ark. Stat.Ann. tit. 67, ch. 10 (1947). Its operating funds were obtained almost wholly from the public in so-called deposits or certificates paying 6 to 6½ per cent interest. It made loans on uncompleted residences called "shell" homes and also invested in other property and business operations. Its deposits exceeded $8,400,000 when a run started against Peoples on March 14, 1968, caused by a suit brought by the Securities and Exchange Commission against a similar though unrelated loan and thrift institution located in the same area. This unrelated suit sought to place the Arkansas Loan and Thrift Corporation in receivership because of alleged insolvency and violations of the Securities Act of 1933. Peoples had no connection with the other institution but was similarly structured and operated under the same state statute, which authorized the acceptance of thrift accounts but did not provide for any guarantee or insurance of deposits as is found in federally insured banks and savings and loan institutions.
 
 
 6
 As a result of the run,[3] the debtor was unable to continue payouts to its depositors and on March 27, 1968 the Banking Commissioner of Arkansas filed a petition in the state court for appointment of a receiver and obtained an injunction prohibiting the debtor from accepting future deposits or allowing withdrawals. The debtor consented to the receivership.
 
 
 7
 On May 16, 1968 Peoples filed a voluntary petition in the United States District Court for Arkansas for a proceeding under Chapter XI of the Bankruptcy Act, pursuant to § 322 of the Bankruptcy Act, 11 U.S.C. § 722, alleging it was solvent but that it could not pay maturing debts, including depositors' demands. An unaudited balance sheet of April 30, 1968 showed assets totaling $8,791,536 and liabilities of $8,441,167. The assets consisted largely of cash, cash items, mortgage loan receivables, corporate stock, real property and claims. Liabilities included $7,254,355 of deposits made by over 3000 public investors.
 
 
 8
 When the Chapter XI petition was filed the District Court stayed the state court action and also prohibited deposits and withdrawals. The Securities and Exchange Commission filed its § 328 motion on July 22, 1968 and the matter was referred to the Referee in Bankruptcy as a special master for hearing and report. The Referee on August 8, 1968 appointed a receiver to operate debtor's business at the request of the Securities and Exchange Commission and removed the general manager of the debtor. The Referee held an evidentiary hearing and on September 18, 1968 recommended that the motion of the Securities and Exchange Commission be denied. The Court accepted the recommendation of the Referee and denied the motion of the Securities and Exchange Commission on November 7, 1968, thereby leaving the debtor free to proceed with a proposed arrangement. On December 17, 1968 the Referee determined that the submitted plan of arrangement[4] had been accepted by the requisite number and dollar volume of the unsecured creditors.[5]
 
 
 9
 The District Court at the time it approved the plan of arrangement also approved a plan of settlement of a large claim that the debtor had against Community National Life Insurance Company of Tulsa, Oklahoma. The settlement allowed Community to purchase a 51 per cent control of the equity or capital stock of the debtor for approximately $59,000. The plan of arrangement does not itself affect any of the debts or securities of the debtor other than the publicly held deposit accounts but the proposed settlement of debtor's claims against Community would affect the equity holding, transferring control to Community for an investment of $59,000. More remains to be said in regard to Community's participation in the affairs of the debtor but further background will be illuminating in showing how Community enters into the picture.
 
 
 10
 Until 1965 Peoples was controlled by Sam Sexton, Jr. In 1965 Peoples was purchased by Investors Thrift Corporation controlled by Maurice Markham. Each of these men controlled separate corporations which were in the business of building and selling shell homes. Sexton caused the debtor to purchase from American Home Builders, Sexton's corporation, $3,000,000 in notes secured by mortgages received in the sales of these shell homes. There are still notes outstanding in the principal amount of $1,800,000, a large percentage of which may be difficult to collect. In similar transactions after 1965, debtor bought $500,000 worth of notes from Markham Homes, of which $103,000 in principal amount is still outstanding and may offer collection problems. The Arkansas Bank Commissioner informed the debtor that such purchases were illegal. For this and other reasons debtor in 1967 entered into several transactions designed to alter its investment portfolio.
 
 
 11
 In early 1967 debtor purchased a hotel and office building in Hollywood, California. The purchase price of the hotel was $1,121,000, of which $200,000 was paid in cash. A note was given for the remainder. The debtor purchased the office building for $460,000, of which $50,000 was paid in cash and the balance represented by a note. Debtor spent $200,000 improving these properties. However, the Bank Commissioner informed the debtor that these also were improper investments and were to be disposed of immediately.
 
 
 12
 The equity interest in the hotel and the office building was sold to Amco Industries in June 1967. Amco paid Peoples with Amco convertible debentures in the amount of $1,000,000 and assumed the mortgage obligation. Shortly thereafter, Amco became financially distressed. As a result, Peoples exchanged its debentures for one-half interest in the office building, previously sold to Amco, and for 150,000 shares of Amco stock which were subject to an investment letter and an option held by Irvru Inc. (which had recently acquired control of Amco) to buy the stock for $5 per share until August 31, 1969, and for $6 per share until June 30, 1970. Markham himself received a personal option on 210,000 shares of Amco stock. The Bank Commissioner informed Peoples that this investment was also improper.
 
 
 13
 In order to extricate itself from these difficulties, and to divest itself of its improper investments, Peoples in December 1967 negotiated a series of agreements with Community National Life Insurance Company. Community agreed to purchase the Amco stock for $6 per share if the Irvru option was not exercised. Community also agreed to buy debtor's authorized but unissued stock for $1,400,000 and the stock of Peoples held by Investor's Thrift Corporation for $600,000. Peoples and Community also agreed that Peoples would sell mortgage notes in an amount of $1,650,000 to Richmond Life Insurance Company which was controlled by Community for an equivalent amount of cash, and then Peoples would use the cash to purchase Community's holdings of Richmond stock. Before receiving the stock, Peoples was informed that the Bank Commissioner did not approve of stock holdings in a foreign life insurance company. Peoples then evidently agreed to transfer the stock to Midwestern Land and Investment Company in exchange for a $1,641,000 mortgage and note secured by a Joplin, Missouri hotel property. However, misrepresentation about the value of the hotel and arithmetical error in determining the payments necessary to retire the note caused Peoples, subsequent to transferring the stock, to reject the transaction. The Richmond stock was transferred to Midwestern without proper corporate authorization of Peoples, apparently because of some unexplained ambiguous directions issued by Peoples' management. In essence, Peoples has now traded away $1,650,000 in mortgage notes and has nothing to show in return. At present, Community refuses to honor its take-out commitment on the Amco stock and has reneged on its original commitment to purchase the debtor's unissued stock. Shortly after the debtor filed its Chapter XI petition it also petitioned the Court for an order that Community or Richmond return the Richmond stock or value for it. Suit was also filed demanding specific performance of Community's agreements or damages of $3,041,050 for failure to deliver the Richmond stock and failure to purchase debtor's authorized but unissued shares.
 
 
 14
 We now examine the District Court's ruling on the Securities and Exchange Commission's motion to transfer the proceeding to Chapter X, and the Court's approval of the debtor's plan of arrangement.
 
 Chapter XI of the Bankruptcy Act states:
 
 15
 "The judge may, upon application of the Securities and Exchange Commission or any party in interest, * * if he finds that the proceedings should have been brought under chapter X of this Act, enter an order dismissing the proceedings under this chapter, unless, * * * the petition be amended to comply with the requirements of chapter X * * *."
 
 
 16
 Similarly, where a petition is brought under Chapter X the judge must dismiss the petition if "adequate relief would be obtainable by a debtor's petition under the provision of Chapter XI * * *". Thus in neither case may the debtor determine conclusively for himself the chapter under which the bankruptcy proceeding will take place. As the Supreme Court said in S. E. C. v. American Trailer Rentals Co., 379 U.S. 594, 607, 85 S.Ct. 513, 520, 13 L.Ed.2d 510 (1965):
 
 
 17
 "In enacting these two distinct methods of corporate rehabilitations, Congress has made it quite clear that Chapters X and XI are not alternate routes, the choice of which is in the hands of the debtor. Rather, they are legally, mutually exclusive paths to attempted financial rehabilitation."
 
 
 18
 In essence, the judge must decide which of the two chapters is appropriate under the circumstances of each case.
 
 
 19
 It is now clear that the two chapters serve separate purposes. S. E. C. v. United States Realty, supra. And the "needs to be served" determine the appropriate selection. General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956).
 
 
 20
 Chapter XI was enacted in 1938 as part of the Chandler Bankruptcy Act under the sponsorship of trade creditor groups to replace the proceeding known as composition of creditors under former section 12 of the Bankruptcy Act. Under Chapter XI only unsecured claims may be modified. Such claims usually are held by trade creditors who are knowledgeable about business practices and who are familiar with the debtor. The purpose of Chapter XI is to provide a rapid, economical method for rearranging or scaling down such unsecured debts (usually held by sophisticated creditors) without the comprehensive safeguards provided in Chapter X. The statutory criterion now applicable in Chapter XI (in addition to other requirements) for confirmation is that the proposed plan of arrangement must be in the "best interests of the creditors and [be] feasible." § 366 (11 U.S.C. § 766).[6] Chapter XI is often in the best interests of the trade creditors where the trade creditors are desirous of continuing their relationship with the foundering company and where it is deemed advantageous for business to continue as usual under the same management.
 
 
 21
 Chapter X is designed to provide a procedure where any debts or securities of the debtor may be affected and where an independent study of the debtor's affairs by the court or a trustee is desirable. Full disclosure to all creditors of relevant information is provided before any plan of arrangement is submitted, and any plan of arrangement must be "fair and equitable." § 221, 11 U.S.C. § 621, S. E. C. v. United States Realty, 452 of 310 U.S., 60 S.Ct. 1044, 84 L.Ed. 1293. This gives the unsophisticated creditor much needed protection.
 
 
 22
 The Securities and Exchange Commission has argued in several cases that because Chapter X provides several important safeguards not provided in Chapter XI, such as the appointment of a disinterested trustee to help prepare a plan and to investigate the practices of management, the duty of the Securities and Exchange Commission to deliver an advisory report on such a plan, the requirement that the plan be "fair and equitable," Northern Pacific Ry. Co. v. Boyd, supra, and because under Chapter X the entire capital structure may be dealt with, it is the only appropriate chapter to use in all cases involving large corporations with publicly held securities. The Securities and Exchange Commission points out, "[T]he basic assumption of Chapter X * * * is that the investing public dissociated from control or active participation in the management, needs impartial and expert administrative assistance in the ascertainment of facts, in the detection of fraud, and in the understanding of complex financial problems." Securities and Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 448-449 fn. 6, 60 S.Ct. 1044, 1050, 84 L.Ed. 1293 (1940). But this distinction has never been fully accepted by the Supreme Court. General Stores Corp. v. Shlensky, 350 U.S. 462, 466, 76 S.Ct. 516, 519, 100 L.Ed. 550 (1956) reasoned:
 
 
 23
 "The character of the debtor is not the controlling consideration in a choice between c. X and c. XI. Nor is the nature of the capital structure. It may well be that in most cases where the debtor's securities are publicly held c. X will afford the appropriate remedy. But that is not necessarily so. A large company with publicly held securities may have as much need for a simple composition of unsecure debts as a smaller company. And there is no reason we can see why c. XI may not serve that end. The essential difference is not between the small company and the large company but between the needs to be served."
 
 
 24
 Nevertheless, the Court has recognized that the two chapters serve different but specific purposes. As the Court said in United States Realty, supra, 310 U.S. at 447, 60 S.Ct. at 1049:
 
 
 25
 "* * * in general, * * * the two chapters were specifically devised to afford different procedures, the one adapted to the reorganization of corporations with complicated debt structures and many stockholders, the other to composition of debts of small individual business and corporations with few stockholders * * *."
 
 
 26
 This distinction was recognized and affirmed in Trailer Rentals, supra, 379 U.S. at 608, 85 S.Ct. 513, 13 L.Ed.2d 510.
 
 
 27
 The most recent Supreme Court case to discuss this problem is Trailer Rentals, and we think it is controlling in this proceeding. Mr. Justice Goldberg in speaking for a unanimous court in Trailer Rentals said at 613, at 523 of 85 S.Ct. "* * * although there is no absolute rule requiring that Chapter X be utilized in every case in which the debtor is publicly owned, or even where publicly held debt is adjusted, as a general rule Chapter X is the appropriate proceeding for adjustment of publicly held debt. See SEC v. Canandaigua Enterprises Corp., 339 F.2d 14 (C.A.2d Cir.)" and then reasoned:
 
 
 28
 "Public investors are * * * generally widely scattered and are far less likely than trade creditors to be aware of the financial condition and cause of the collapse of the debtor. They are less commonly organized in groups or committees capable of protecting their interests. They do not have the same interest as do trade creditors in continuing the business relations with the debtor. Where debt is publicly held, the SEC is likely, as here, to have become familiar with the debtor's finances, indicating the desirability of its performing its full Chapter X functions. It seems clear that in enacting Chapter X Congress had the protection of public investors, and not trade creditors, primarily in mind." (Trailer Rentals, 379 U.S. at 613-614, 524 of 85 S.Ct.).
 
 
 29
 Thus, in most cases of public security or debt ownership, the needs to be served will on balance require a proceeding under Chapter X, and generally the more extensive the public investment is, the greater the need for Chapter X protection.
 
 
 30
 Still, there are exceptions to the general rule that where public investor creditors are involved Chapter X is the proper proceeding. But as Shlensky and Trailer Rentals indicate, the exceptions are held within very narrow limits. For example:
 
 
 31
 "`Simple' compositions are still to be effected under Chapter XI. Such a situation, even where public debt is directly affected may exist, for example, where the public investors are few in number and familiar with the operations of the debtor, or where, although the public investors are greater in number, the adjustment of their debt is relatively minor, consisting, for example, of a short extension of time for payment." Trailer Rentals at 614, 85 S.Ct. at 524 (discussing Shlensky).
 
 
 32
 Under these criteria it is clear that Chapter X is the appropriate proceeding for the debtor in this case. First, we have a large number of investor creditors — 3000 — with a significant financial investment of some 7.2 million dollars. These depositor-creditors are anything but intimately familiar with the operations of the debtor, or with business and finance in general. The proposed adjustment is not minor by any standard, but would result in a significant reduction in the claims of the depositor-creditors — approximately 45 per cent for depositors who choose an immediate payout. Under such circumstances the "fair and equitable" requirement of an arrangement under Chapter X is probably more beneficial to the depositors than the requirement in Chapter XI that the arrangement merely be in the best interests of the creditors and feasible.
 
 
 33
 Second, there is much evidence of mismanagement and self-dealing, particularly in regard to the mortgage holdings on the shell homes, the arrangement providing that Markham would privately receive a large block of Amco stock, and the fast and loose shuffling of debtor's corporate assets between Community, Richmond Life, and Midwestern Land & Investment Co. As the Court said in Shlensky, supra, 350 U.S. at 466, 76 S.Ct. at 519, in explaining its preference therein for Chapter X over Chapter XI, "Re-adjustment of the debt structure of a company, without more, may be inadequate unless there is also an accounting by the management for misdeeds which caused the debacle." Although the arrangement calls for new management it is arguable that Community, which is enmeshed in the complicated, multi-faceted intercorporate arrangements involving the debtor and is also closely connected with the alleged misrepresentation regarding the Midwestern transaction, and which is potentially in an adverse position to debtor in several law suits, is not the ideal choice to lead the new management group. Section 167 of Chapter X (11 U.S.C. § 567) provides for a thorough investigation by a disinterested trustee of possible mismanagement and an estimate as to whether new management is needed. There is no similar requirement under Chapter XI.
 
 
 34
 The debtor suggests that the proposed arrangement under this Chapter XI proceeding meets all the requirements of Chapter X. This is not correct. No independent trustee is provided to inform the depositors of their actual financial position, and the plan is not fair and equitable as required under Chapter X. The claims of the depositor-creditors are being cut almost in half while the interests of the equity holders are still maintained and recognized.
 
 
 35
 The argument of the debtor that the decision to transfer the case from Chapter X to Chapter XI is within the discretion of the District Judge, and that this discretion was not abused here is also unacceptable. Debtor cites Grayson-Robinson Stores, Inc. v. Securities and Exchange Commission, 320 F.2d 940 (2d Cir. 1963), and In Re Herold Radio & Electronics, 191 F.Supp. 780 (S.D.N.Y. 1961) for the proposition that a bankruptcy judge has the discretionary powers of an equity judge and thus the Court's decision here to deny the Securities and Exchange Commission's motion was within that discretionary power. The debtor quotes the District Court in the instant case as saying at 601 of 292 F.Supp.:
 
 
 36
 "Under Chapter X it is of course necessary that it be shown that the relief necessary for debtor is not available under Chapter XI. While Chapter XI and Chapter X are mutually exclusive, and it may be said that certain considerations militate toward Chapter X such as evidence of mismanagement, more than minor readjustment of public debt, a large amount of public debt exists, the trustee under Chapter X is necessary, or debtor may overreach the holders of debt, still these are not absolutes but merely preferences or presumptions that furnish a guideline for the Court in exercising its discretion." (Footnotes omitted.)
 
 
 37
 We agree that the factors enumerated by the District Judge and considered as significant in the controlling Supreme Court cases of United States Realty, Shlensky and Trailer Rentals are not absolute in the sense of being blackletter rubrics but we do think the allowable discretion accorded the District Judge is narrowly circumscribed and the significant factors enunciated in the Supreme Court cases must be accorded due weight in deciding the ultimate issue of whether the debtor should be permitted to proceed under Chapter XI rather than Chapter X; and, of course, this decision would have to be made in conjunction with the other statutory criteria. We, therefore, do not view the standard on appeal as one of an abuse of discretion but rather as one of whether the District Court has exceeded the applicable bounds of discretion in applying the equitable principles and standards set forth in the above cases.
 
 
 38
 And as the Court said in Herold Radio, supra, 191 F.Supp. at 784, "Discretion that is premised on the wrong criteria or that disregards well-settled principles is said to transcend `the allowable bounds' and is reversible." The standard of review is not whether the District Court abused its discretion, but whether its discretion was exercised within allowable bounds and this in turn is dependent on the application of appropriate equitable principles. General Stores, supra.
 
 
 39
 The District Court and debtor have virtually ignored Trailer Rentals, which is dispositive of this matter. There the Court said at 619 of 379 U.S., at 527 of 85 S.Ct.:
 
 
 40
 "Nothing in [Shlensky] supports respondent's view that the issue of whether Chapter X or Chapter XI is required permits open-ended discretion by a district court to decide on a case-by-case basis, without reliance on the principles which we have here reaffirmed, whether in its opinion it would be better for a particular debtor to be in Chapter X or Chapter XI. * * * [S]uch open-ended discretion would be bound to result in decisions reflecting the `particular experience and predilections' of the district judge involved."
 
 
 41
 Under the criteria as discussed by the Supreme Court in United States Realty, Shlensky, and Trailer Rentals, we feel that the District Court was obliged under the factual circumstance of the case to transfer this proceeding to Chapter X.[7] In fact we think the language of Trailer Rentals is particularly appropriate to the case at bar where Mr. Justice Goldberg, after a discussion of the applicable principles, stated at 615 of 379 U.S., at 525 of 85 S.Ct.:
 
 
 42
 "* * * [I]t is obvious that Chapter X is the appropriate proceeding for the attempted rehabilitation of [the debtor] * * *. Here public debts are being adjusted. The investors are many and widespread, not few in number intimately connected with the debtor, and the adjustment is quite major and certainly not minor. These facts alone would require Chapter X proceedings under the above-stated principles."
 
 
 43
 We reject debtor's arguments that there is no evidence of mismanagement, and that the arrangement was fair and equitable for the depositor-creditors. Equity holders are continued in business for a long period of time (five years) at the sole expense of the public debt holders. The evidence of mismanagement should be investigated by a disinterested trustee and the debtor's claims evaluated and pursued by a trustee having no tie and owing no allegiance to potential legal adversaries.
 
 
 44
 Debtor also suggests that speed and economy are of the essence in this case, and that a transfer to Chapter X will result in a collapse of the settlement agreement to the great disadvantage of the depositor-creditors. We cannot say on the record before us that it is clear the depositor-creditors will be financially advantaged by proceeding under one chapter or the other. Only an in-depth investigation by a disinterested trustee as to the real value of the debtor's assets could provide an answer to this question. And only in a Chapter X proceeding is that type of investigation possible. The debtor cannot be expected to investigate itself.
 
 
 45
 Speed and economy are not the only criteria to be considered. We are sympathetic with the viewpoint of the District Court in desiring to encourage settlement of the debtor's claims, to avoid lengthy litigation, and to afford a speedy and more economical method of obtaining the financial rehabilitation of the debtor; and it is only with reluctance that we reverse the District Court's conclusion that the proposed plan is in the best interest of the creditors and the debtor, as the District Judge is undoubtedly in a preferred position in passing upon the evidence. We, however, feel "the needs to be served" criteria of Shlensky as interpreted by Trailer Rentals at 610 of 379 U.S., at 522 of 85 S.Ct. include,
 
 
 46
 "* * * [S]uch factors as requirements of fairness to public debt holders, need for a trustee's evaluation of an accounting from management or determination that new management is necessary, and the need to readjust a complicated debt structure requiring more than a simple composition of unsecured debt."
 
 
 47
 and these make Chapter X the appropriate proceeding. Although the debt structure here is not complicated, we do not think that the debtor's proposal to breathe new life into the equity interest by a major scaling down of the public unsecured creditors is in the "best interest of the creditors." Granted, that an interested liquidator of a debtor's assets may achieve a greater recovery, this still does not warrant the substantial diminution of the unsecured public debt that is contemplated in the debtor's plan of arrangement. The public debt holders are entitled in this case to fair and equitable treatment. This they have obviously not received. We feel that under the circumstances of this case, the public investors, here depositor-creditors, need the extensive protection provided by Chapter X of the Bankruptcy Act; namely, a disinterested trustee, a plan of arrangement formulated by the trustee (rather than the debtor) with the SEC's analysis of the plan and its informative report to the public creditors, an investigation of past management practices and prosecution of any legitimate claims, and the fair and equitable requirement of strict priority of creditors' claims over equity interests.
 
 
 48
 Therefore, we reverse and remand the case for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The Memorandum Opinion of the Honorable Paul X. Williams, United States District Judge for the Western District of Arkansas, is reported at 292 F.Supp. 594 (W.D.Ark.1968)
 
 
 [2]
 Peoples Loan and Investment Company will be referred to as debtor or Peoples
 
 
 [3]
 The debtor was forced to pay its depositors upon their demand 1.22 million dollars in excess of deposits received during the period of March 14, 1968 through March 27, 1968
 
 
 [4]
 The proposed plan of arrangement provides for the payment of 10 per cent of each claim in cash at the time of consummation of the arrangement and the balance of the claim to be paid at the end of five years from consummation, without interest, but with a 10 per cent bonus on the balance. As an alternative each depositor may elect to receive in full settlement of his claim 50 per cent of the total at the time of consummation, making a total of 55 per cent on his claim, or may elect larger percentages in full settlement in an increasingly graduated amount within the five-year period. The percentages proposed are as follows:
 "At the time of consummation all balances are valued at 50%. The value increases at 5/6th of 1% per month, or at the rate of 10% per annum, so that the total amount that may be withdrawn by each investor in full settlement of his claim within the five year period after consummation may be illustrated as follows:
 TOTAL
 % of balance amount to be
 (balance is 90% received (including
 of original % of original initial 10%
 claim) claim payment)
At consummation: 50% 45% 55%
End of first year: 60% 54% 64%
End of second year: 70% 63% 73%
End of third year: 80% 72% 82%
End of fourth year: 90% 81% 91%
End of fifth year: (100%
 + 10% "bonus") 110% 99% 109%"
No interest is to accrue on the depositors' claims after March 31, 1968.
 
 
 [5]
 Out of some 3000 depositor-creditors 2019 voted on the proposed plan with 95.39 per cent or 1926 accepting the plan and 4.61 per cent or 93 rejecting it
 
 
 [6]
 Prior to an amendment in 1952 and at the time of the United States Realty decision the plan of arrangement had to be "fair and equitable." This requirement was eliminated in Chapter XI proceedings by amendment in 1952, 66 Stat. 436 (1952). "Fair and equitable" is a phrase of art, see Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), meaning that the creditors have absolute priority and that creditors' interests cannot be sacrificed one iota to the interests of the equity holders. "Best interests of the creditors" means only that under Chapter XI the creditors must receive a value greater than they would receive under a forced liquidation. 9 Collier, Bankruptcy § 9.17 (14th ed. 1968)
 
 
 [7]
 As noted in General Stores Corp. v. Shlensky, 350 U.S. fn. p. 469, 76 S.Ct. p. 520:
 "At the time of the Realty decision, if a proceeding was found to have been improperly brought under Chapter XI, it had to be dismissed and a proceeding started anew under Chapter X. Section 30 of the Act of July 7, 1952, amended the law so as to allow a transfer of a Chapter XI proceeding, if improperly filed thereunder, to Chapter X. 66 Stat. 420, 432, 11 U.S.C.A. § 728, and see H.R.Rep. No. 2320, 82d Cong., 2d Sess. 19."